# Exhibit A

## PLAINTIFFS' PROPOSED JURY INSTRUCTION #19

Added Motion by Plaintiffs: Spoliation

It is undisputed in this case that Paul MacKenzie took notes concerning Ms. Dunn's employment and termination from Condor during the time of Ms. Dunn's employment with Condor.  It is also undisputed that Mr. MacKenzie used these notes to create a typed memorandum approximately one year after Ms. Dunn's termination to identify alleged explanations for her termination. It is undisputed that Condor destroyed these contemporaneous notes.

You have not had the opportunity to see the notes of Mr. MacKenzie.

You have the right to conclude that the missing evidence, had you been able to view it, would have been helpful to Ms. Dunn's case and detrimental to Condor's case.

The reason for this rule is that where you would normally expect a party to produce evidence but, without reasonable explanation, it fails to do so, it leaves a natural inference that the non-producing party fears exposure of facts which would be unfavorable to it.


Citation of Authority

*Motown Record Co. v. DePietro*, No. 04-cv-2246, 2007 WL 1725604 (E.D. Pa. June 11, 2007);

*Rhein-Hawes v. Vanguard Group, Inc.*, No. 05-cv-665, 2005 WL 3441228, at *2 (E.D. Pa. Dec. 14, 2005).

2

# Exhibit B

**COMMONWEALTH OF PENNSYLVANIA**

**GOVERNOR'S OFFICE**

**PENNSYLVANIA HUMAN RELATIONS COMMISSION**

REGINA DUNN

      v.               :     PHRC Docket No.: 200803061

                         :     EEOC Charge No.: 17F200960834

CONDOR AUTOMOTIVE GROUP, LLC,
MERCEDES BENZ OF FT. WASHINGTON

**RESPONDENT'S ANSWER IN OPPOSITION TO COMPLAINANT'S
CHARGE OF DISCRIMINATION**

    1.    Denied. These allegations are denied as conclusions of law.

    2.    Admitted.

    3.    It is admitted that Respondent, Condor Automotive Group, LLC does business at

404 Pennsylvania Ave., Fort Washington, PA 19034. Respondent, Condor, is a management

company providing management services to Respondent, Mercedes Benz of Ft. Washington,

Inc., which also does business at 404 Pennsylvania Ave., Fort Washington, PA. Only Mercedes

Benz of Ft. Washington was Complainant's employer.

    Second 3.    Denied. The allegations contained in this paragraph are conclusions of

law to which no responsive pleading is required. To the extent an answer is deemed required, it

is denied that there was any discrimination against Complainant based on her sex or

disability/perceived disability and further denied that there was any retaliation against

Complainant based on any complaints of harassment or discriminatory conduct.

**Allegations of Discrimination Retaliation**

    A.

[1]      Admitted in part, denied in part.  It is admitted that Complainant was hired by

Steve Silverio, Chief Operating Officer for Condor Automotive Group, LLC to be the General

Manager of Mercedes Benz of Ft. Washington on or about October 3, 2007.  It is further

admitted that at the time of Complainant's hire,   Complainant reported to Joseph Esposito,

General Manager who in turn reported to Mr. Silverio, Chief Operating Officer who, in turn,

reported to Carlos Hoz de Villa, Chief Executive Officer of Condor Automotive Group, LLC.

The remaining allegations are denied.  At the time of Complainant's discharge, she reported to

Paul MacKenzie, General Manager of Mercedes Benz of Fort Washington who reported to

Carlos Hoz de Villa, Chief Executive Officer of Condor Automotive Group, LLC.  Complainant

was discharged because she failed to perform her responsibilities as General Sales Manager in an

effective manner, demonstrated a complete lack of candor with the General Manager and

participated in business transactions that were not in compliance with the business relationship

and rules Respondent had with its creditors and manufacturer resulting in many problems for the

dealership.

[2]      Denied.  The allegations contained in this paragraph are denied as follows:

a. These allegations are specifically denied.

b. These allegations are specifically denied.

c. These allegations are specifically denied.

d. These allegations are specifically denied.

e. These allegations are specifically denied.

f. These allegations are specifically denied.

g. These allegations are specifically denied.  While Mr. Silverio did recommend

to Mr. Esposito that Complainant needed to be transferred to the position of Finance and

Insurance Manager instead of General Sales Manager, the reason was based solely on

Complainant's poor performance as General Sales Manager and not at all based on her gender.

       h. These allegations are specifically denied.

       i. These allegations are denied as alleged.  Mr. Petruziello never called

Complainant this name directly.

       j. These allegations are denied as alleged.  Mr. Petruziello did have issues with

Complainant's candor and performance but did not put the issue in these terms.

       k. Denied as alleged.  It is denied that the issues that Mr. Petruziello and Mr.

Silverio had with Complainant were in any way related to her gender or sex.  Mr. Petruziello and

Mr. Silverio had issues with Complainant's performance as General Sales Manager in that the

sales generated by the Sales Department over which she was in charge were lagging.  They relied

to heavily on fleet sales and there was a significant decline in retail sales under Complainant's

management.  These performance issues and failings related to the performance of the

department were the basis upon which Mr. Silverio recommended a change in position for

Complainant to Mr. Esposito and the basis upon which Mr. Petruziello voiced his opinion that

she was not getting the job done.

       l. These allegations are specifically denied.

       m. These allegations are specifically denied.

       n. These allegations are specifically denied.

       o. These allegations are specifically denied.  There was a monthly General

Managers meeting.  Each month, the General Manager of each store was asked to bring a

management person from the store who was being developed for advancement.  It was generally

a different person each month.  Ms. Dunn attended the General Managers meeting at least 2

times. On the occasion when Mr. Palmer, the New Car Manager, was invited to attend, the reason Ms. Dunn was not initially invited is that she had attended the GM meeting the month before. When a request was made by Mr. Esposito to Mr. Silverio for Ms. Dunn to also attend the meeting, arrangements were made for both Ms. Dunn and Mr. Palmer to attend.

p. Denied. It is denied that Mr. Esposito ever raised a concern to Mr. Silverio about any discrepancy between what Ms. Dunn's pay plan was and what she was being paid. The statements attributed to Mr. Silverio in these allegations are specifically denied.

[3]    Denied. These allegations are specifically denied.

[4]    Denied. These allegations are specifically denied.

a.    Denied. It is denied that Steve Silverio ever described Regina Dunn in these terms. It is admitted only that on more than one occasion, Mr. Silverio criticized the performance of the Ft. Washington store because projected sales often overstated actual sales and income at the end of the month by significant amounts and it was the General Sales Manager's responsibility to accurately track and report the sales and the General Manager's obligation to double check that reporting.

b.    Denied. This allegation is denied; Mr. Silverio never used that term.

c.    Denied. This allegation is denied; Mr. Silverio never used that term.

d.    Denied. The only comments regarding the need for Ms. Dunn to be replaced were that Ms. Dunn did not have control over her sales staff and her complaints that everyone is going around her is bad management either at Ms. Dunn's level or Mr. Esposito's level and it needs to stop.

e.    Denied. This allegation is denied; Mr. Silverio never made such comments about Ms. Dunn to Mr. Esposito or anyone else.

f.    Denied.  The only pressure within the first few months of the Ms. Dunn's employment was for the Sales Department to use the Condor reporting systems in place.

g.    Denied as alleged.  Mr. Petruzillo never directly called Ms. Dunn by this name.

h.    Denied.  It is denied that Mr. Silverio ever refused to communicate with Regina Dunn during the time frame that she worked for Mr. Esposito.

i.    Denied.  Any and all criticism of Ms. Dunn's performance was justified.  Respondent denies the allegation of harshness.  It is admitted that concerns were addressed directly as they are with all employees.

j.    This allegation is denied, Mr. Silverio never did this.

k.    Denied.  Mr. Silverio has no recollection of making such a statement.

l.    Admitted in part, denied in part.  It is admitted that there was a monthly General Managers meeting.  It is further admitted that each month, the General Manager of each store was asked to bring a management person from the store who was being developed for advancement.  It was generally a different person each month.  Ms. Dunn attended the General Managers meeting at least 2 times.  On the occasion when Mr. Palmer, the New Car Manager, was invited to attend, the reason Ms. Dunn was not initially invited is that she had attended the GM meeting the month before.  When a request was made by Mr. Esposito to Mr. Silverio for Ms. Dunn to also attend the meeting, arrangements were made for both Ms. Dunn and Mr. Palmer to attend.

m.    Denied.  It is denied that Mr. Esposito ever raised a concern to Mr. Silverio about any discrepancy between what Ms. Dunn's pay plan was and what she was being paid.  The statements attributed to Mr. Silverio in these allegations are specifically denied.

[5]      Denied as alleged.  It is admitted only that Complainant sent a letter to Mr. Hoz de Villa on Agust 5, 2008 after she had been advised at a meeting on August 4, 2008 that the performance of the sales department was unacceptable and that she and Mr. Esposito were accountable for the failing of that department and that they had thirty (30) days to address the problem and improve performance.

[6]      It is denied without knowledge as to who the employees are that Complainant alleges were aware.  It is admitted only that individuals who were asked about information contained in the letter in the course of investigating the substance of the letter were made aware that concern had been raised.

[7]      Denied as alleged.  It is admitted only that with regard to certain aspects of the letter's contents, an attorney was retained to do the investigation.

[8]      Denied.  These allegations are denied.

[9]      Admitted.

[10]    These allegations are specifically denied.  Mr. Silverio denies making the alleged statements.  Mr. Esposito suggested that Mr. Silverio meet with Ms. Dunn and Mr. Esposito and in the suggestion indicated he did not sign up for this brain damage.

[11]    Denied.  Mr. Silverio denies ever warning Ms. Dunn to do anything of the sort or threatening her as alleged.

[12]    Denied as alleged.  This statement is taken out of context.  Mr. Silverio indicated that he was not aware of any of the conduct that Ms. Dunn perceived to be undermining, specifically, her claim that Mr. Silverio, by speaking directly to staff of the dealership, he undermined Ms. Dunn's status as General Sales Manager.

[13]   Denied as alleged. Complainant was advised that there was no finding of gender or sexual harassment as to Mr. Silverio. There was a decision made to transfer Mr. Silverio to the West Chester facility to eliminate any concern about any further problem.

[14]   Admitted in part, denied in part. It is admitted that Joseph Esposito was discharged on or about October 6, 2008. It is denied that there was any statement about downsizing made to Mr. Esposito. Mr. Silverio made clear that Mr. Esposito's discharge was based on his poor performance as General Manager. It is admitted that Mr. Esposito was replaced by Paul MacKenzie.

[15]   Denied. These allegations are specifically denied.

[16]   Denied. Mr. Silverio was transferred to the position of General Manager of the West Chester dealership in October 2008 because of the decline in the economy and its impact on car sales requiring a downsizing of upper management. Mr. Silverio would have no responsibility for communicating with Complainant in this position. The allegations as to Paul MacKenzie are specifically denied.

[17]   Admitted in part, denied in part. It is admitted that Complainant was discharged on or about November 4, 2008. Mr. MacKenzie was the decision maker regarding this and he made it clear to Complainant in the discharge meeting that she was being discharged due to her performance and her involvement in transactions that put the dealership in jeopardy with the law and with Mercedes Benz. It is denied Complainant was told her position was being eliminated.

[18]   Admitted in part, denied in part. It is admitted that a new General Sales Manager was hired for Mercedes Benz of Fort Washington.

[19]   Denied. Respondent's employment decisions relating to Regina Dunn were all made for legitimate, non-discriminatory and non-retaliatory reasons. Specifically, Ms. Dunn had

failed to perform her job effectively under the management of Joseph Esposito and received a warning to this effect on August 4, 2008. After Mr. Esposito was discharged, Complainant was given an opportunity to prove herself to the new General Manager, Paul MacKenzie but failed to do so by: 1. Failing to be honest with Mr. MacKenzie about certain business transactions in which Ms. Dunn and Mr. Esposito had committed the dealership which were against the dealerships interest; 2. Going against Mr. MacKenzie's direct orders regarding the dollar amount for which a vehicle would be repurchased from a prior buyer; 3. Failing to report the use of inventory by customers placing the dealership in jeopardy of violation of its floor plan agreement; and 4. demonstrating a general lack of candor and commitment to work as a teamplayer with Paul MacKenzie as General Manager.

[20]   Denied. Respondents have policies in place and staff is trained on those policies to prevent unlawful discrimination and harassment in the work place.

[21]   Denied. Respondents have policies in place and staff is trained on those policies to prevent unlawful discrimination and harassment in the work place.

[22]   These allegations are denied as conclusions of law and fact.

4.   Denied as conclusions of law or fact.

5.   Denied as conclusions of law or fact.

6.   Denied.

WHEREFORE, Respondents pray that Complainant's Complaint be dismissed for lack of probable cause and judgment be entered in favor of Respondents and against Complainant.

## AMENDED COMPLAINT

A.   [1]   Admitted in part, denied in part. It is admitted that Complainant was hired by Steve Silverio, Chief Operating Officer for Condor Automotive Group, LLC to be the General

Manager of Mercedes Benz of Ft. Washington on or about October 3, 2007. It is further admitted that at the time of Complainant's hire, Complainant reported to Joseph Esposito, General Manager who in turn reported to Mr. Silverio, Chief Operating Officer who, in turn, reported to Carlos Hoz de Villa, Chief Executive Officer of Condor Automotive Group, LLC. The remaining allegations are denied. At the time of Complainant's discharge, she reported to Paul MacKenzie, General Manager of Mercedes Benz of Fort Washington who reported to Carlos Hoz de Villa, Chief Executive Officer of Condor Automotive Group, LLC. Complainant was discharged because she failed to perform her responsibilities as General Sales Manager in an effective manner, demonstrated a complete lack of candor with the General Manager and participated in business transactions that were not in compliance with the business relationship and rules Respondent had with its creditors and manufacturer resulting in many problems for the dealership.

2.      It is admitted that Complainant was discharged from employment on November 4, 2008.

3.      Admitted in part, denied in part. It is admitted that a complaint was filed, the exact date of filing is not known. It is admitted that Respondents were served with a copy of the complaint.

4.      Denied.

5.      Denied. These allegations are specifically denied.

6.      Denied. These allegations are specifically denied.

7.      Denied. As the allegation of any further retaliatory conduct is denied, so are these allegations.

8.      Denied as a conclusion or law or fact.

9.    Denied as a conclusion of law or fact.

10.   Denied as a conclusion of law or fact.

B.    Denied as a conclusion of law or fact.


WHEREFORE, Respondents pray that Complainant's Complaint be dismissed based on a

lack of probable cause and based on lack of merit.

KENNEDY, DANIEL & LIPSKI


Elizabeth F. Walker, Esquire
Attorney for Respondents
KENNEDY, DANIEL & LIPSKI
1818 Market Street, Suite 2510
Philadelphia, PA 19103
(215) 430-6386
(215) 430-6351 (fax)
Attorney ID No.: 43550
Beth.Walker@Zurichna.com

1651

**Verification**

I, ___Stace Silverio_____ verify that the statement
made in the foregoing Verified Answer to Complaint are true and
correct to the best of my knowledge and belief. I understand that
false statements herein are subject to the penalties of 18 Pa. C.S.
4904 relating to unsworn falsification to authorities.


Dated: ___5/25/09_____

By: _____

___C.O.O_____

# Exhibit C

Regina Dunn  vs  Condor Automotive Group, LLC, et al.; Mercedes-Benz of Fort
Washington

PHRC Case No.200803061

EEOC No. 17F200960834


Certificate of Service


          Pursuant to the requirements of 1 Pa. Code § 33.31, I hereby certify that I
have this day served the foregoing Complaint by first class mail, postage prepaid, as
follows:


Regina Dunn                                      Caren N. Gurmankin Esquire
▮▮▮▮▮▮▮▮▮▮                                        1525 Locust Street, 9th Floor
Maple Glen PA 19002                              Philadelphia PA 19102



Condor Automotive Group, LLC, et al.;
Mercedes-Benz of Fort Washington
404 Pennsylvania Avenue
Fort Washington PA 19034




Dated 16th day of January, 2009


*Sokun Nov*
Sokun Nov

# Exhibit D

Paul Mackenzie
300 Kennard Road
Perkasie, PA 18944

## Regina Dunn and Andrew Mogilyansky

October 6th 2008 – I met Regina Dunn for the first time and told her that I was aware she had a
long relationship with the previous General Manager, but whatever went on in the dealership
before my arrival was in the past. If she was forthright, it would have no bearing on her future
employment. I assured her that if she gave me a complete update on ALL open issues in the
dealership (good and bad) and her full and candid support, I would consider keeping her in her
current position. I made it clear this was an on the job interview.

October 8th 2008 – By the end of the day I had already caught Regina Dunn in several serious
lies and again I urged her to be candid. I also asked why she spent hours walking around the
dealership, talking on her cell phone in an animated fashion. She said was talking to her
children's nanny and she assured me these conversations would end soon. I suspected she was
talking to Joe Esposito (covering tracks) and I said so. She neither confirmed or denied this, she
just walked away. I told Steve Silverio of these events but he gave no input. I pushed further and
told him I also didn't believe she had the requisite skills for her position. He told me to give it
another week and consider her for a finance position. I told him I would; but reluctantly.

October 9th – I moved my (actual) desk into Regina's office to watch her work and assess her
desk and turn over skills up close. My fears were confirmed immediately and in my opinion she
was a substandard desk person at best and her turn over skills were very combative. In many
cases she alienated customers, and in some instances she got into arguments with them. I
apprised Steve Silverio of these findings and again I asked to be allowed to fire her. He merely
reminded me of his proviso on hiring me (*see attachment – The Interview Process*) and refused.

October 10th – I met Andrew Mogilyansky for the first time. He was evasive, arrogant, and rude,
and had the audacity to sit at the desk in the General Manager's office (my office) without asking
permission and then log on to the MBUSA Net Star system through his laptop. I immediately
unplugged his ethernet connection and asked how he got this access. He said he had carte
blanche to order his own cars via Joe Esposito and Regina Dunn. They even allowed him to use
their passwords. I immediately put a stop to this and made it clear that to continue to do business
with Mercedes-Benz of Fort Washington he needed to FULLY explain his business model to me.

He then briefly explained that he shipped cars to the Ukraine and had found a way to cheat the
MBUSA system of tracking cars through the PIERS reports. I asked him to go into more detail
but he said he had no time and would come back in a few days when he did. I made it clear again

000510

that I was now in charge and if he did not keep this promise I would shut him down. I reported these events to Steve Silverio who asked that I keep this next appointment and report back.

October 13th – I met Andrew Mogilyansky for the second time and we spent two hours together going over his business model. He was evasive on many points but I made it lucid (again) that until I was happy with his explanations, any business with Mercedes-Benz of Fort Washington was over. He left the meeting clearly agitated. What I had learned so far was that that Mr. Mogilyansky's business model was predicated on the favorable exchange rate between the Euro over the Dollar and as soon as they begin to equal out, he would have an inventory of cars in Bremerhaven, Germany with a reducing value. In other words, distressed merchandise! I asked him how long he could finance that anomaly before shipping the cars elsewhere and he simply stated, "For a while!"

October 14th – I spoke to Steve Silverio and relayed my findings, insisting that the company immediately cease and desist doing business with Mr. Mogilyansky as we would most certainly face massive charge backs from what we had sold him already. I also told Steve that I suspected that Regina Dunn was in bed with Mr. Mogilyansky (financially) and insisted once more that she be terminated. He declined on both counts and finally told me why. Regina Dunn was threatening to sue Steve Silverio for sexual harassment and firing her now, could trigger this event. I was livid that I was not told the truth about this, or Mr. Mogilyansky and I said so. Mr. Silverio apologized and said he would get back to me in a few days with some direction. I told him I had another meeting with Mr. Mogilyansky in two days and I needed an answer by then. I didn't hear from Mr. Silverio before that meeting.

October 16th – I met Andrew Mogilyansky for the third time and he was desperate to order more vehicles. I still refused unless he was completely candid and answered ALL of my questions this time. He began to open up and I learned a great deal, including the fact that he had several hundred cars sitting in Germany. 150 of these were from Mercedes-Benz of Fort Washington! At this point I categorically stated that I would sell him no more cars. He merely smiled and said he had a meeting the next day with Steve Silverio to work it all out.

October 17th – I finally got in contact with Steve Silverio who rushed me off the phone and refused to acknowledge he had a meeting with Mr. Mogilyansky that day. Feeling uneasy, I reached out to Carlos Hoz de Vila.

October 20th – As soon as Carlos Hoz de Villa arrived at work I attended a meeting with him and Vince to explain what I had found. They listened intently and when I had finished Vince became extremely angry and yelled at Carlos, *"I told you we should never have listened to Steve!"* Carlos thanked me and told me he would talk to Steve and get back to me. Before I left the office, they asked what our exposure was and I told them it was over $1,000,000. The look on their faces was pure shock. I also gave them my suspicions about Regina Dunn and asked if I could fire her. Vince agreed that it was time but he wanted to consult an attorney first.

October 21st – I was informed by Carlos and Vince that Steve Silverio still had confidence in Andrew Mogilyansky's business model and from this point forward Steve would handle ALL interactions with him. I told them they were making a bad decision and insisted that when the charge backs came in, my pay plan would not be affected by it. They agreed immediately. I had no more contact with Mr. Mogilyansky except to nod hello as he came through my showroom.

October 22nd – I spoke to an attorney in Vince's office (via phone) about Regina and he told me what to say and how to say it. He also insisted that Steve Silverio have no part in it, but either Carlos or Vince should be present. It was decided Carlos would be there.

November 3rd – I fired Regina Dunn in the presence of Carlos Hoz de Villa!

**The Running Total of Charge backs so far**

**Current Fleet Incentive Charge backs for 2009 - $86,850**

**+**

Other related charge backs in April 2009 - $10,150.00

Other related charge backs in August 2009 - $9,664.00

Other related charge backs in September 2009 - $188, 053.00

Other related charge backs in October 2009 - $91, 102.00

Other related charge backs in November 2009 (So far) - $108,506.00

Other related charge backs in December 2009 – (No Input Yet)

**Current Total Other related charge backs - $385,819.00**

## Running Total of ALL Charge Backs - $494, 325

## Potential Future Chargeback Total - >$500,000.00

# Exhibit E

Paul Mackenzie

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGINA DUNN, JOSEPH ESPOSITO  :

and                :

PATRICE MACHIKAS        :

   Plaintiffs,     :
           : Civil Action
v.            : No. 10-1662

CONDOR AUTOMOTIVE GROUP, LLC.  :
MERCEDES-BENZ of FORT
WASHINGTON, STEPHEN SILVERIO  :
AND VINCENT PETRUZZIELLO     :

   Defendants.     :

Philadelphia, Pennsylvania
Monday, April 25, 2011

Deposition of PAUL MACKENZIE,
taken pursuant to notice, held at the Console
Law Offices, LLC, 1525 Locust Street,
Philadelphia, Pennsylvania, beginning at
10:05 a.m., on Monday, April 25, 2011, before
Terry Barbara Burke, RMR-CRR.
TERRY BURKE REPORTING
(215) 205-8079
terryburkernr@gmail.com

**Page 2**

APPEARANCES:
STEPHEN G. CONSOLE, ESQUIRE
CAREN N. GURMANKIN, ESQUIRE
Console Law Offices, LLC
1525 Locust Street
Philadelphia, Pennsylvania 19102
Counsel for the Plaintiffs
Regina Dunn and Joseph Esposito

ROBERT A. DAVITCH, ESQUIRE
Sidkoff, Pincus & Green, P.C.
2700 Aramark Tower
1101 Market Street
Philadelphia, Pennsylvania 19107

Counsel for the Plaintiff
Patrice Machikas
ELIZABETH F. WALKER, ESQUIRE
Kennedy Campbell Lipski & Dochney
1818 Market Street, Suite 2510
Philadelphia, Pennsylvania 19103

Counsel for the Defendants
Condor Automotive Group, LLC
and Mercedes-Benz of Fort
Washington, Inc.
WILLIAM E. DENGLER, ESQUIRE
Hardesty & Lloyd
5701 Corporate Center Parkway, Suite 100
Center Valley, Pennsylvania 18034

Counsel for the Defendant
Stephen Silverio
CHRISTOPHER A. TINARI, ESQUIRE
Margolis Edelstein
The Curtis Center, 4th Floor
Sixth and Walnut Street
Philadelphia, Pennsylvania 19106
Counsel for the Defendant
Vincent Petruzziello

**Page 3**

1 ALSO PRESENT:
2   REGINA DUNN
3   PATRICE MACHIKAS
4   - - -
5
6     PAUL MACKENZIE,
7   Perkasie, Pennsylvania, 18944,
8   having been duly sworn, was examined
9   and testified as follows:
10 BY MR. CONSOLE:
11   Q.  Good morning, Mr. Mackenzie.
12   A.  Good morning.
13   Q.  My name is Steve Console.  Together with
14 Karen Gurmankin, who is seated to my left, we
15 have the privilege of representing Regina Dunn
16 and Joe Esposito in connection with their
17 complaints of retaliation and discrimination.
18     Seated further to my left is Robert
19 Davitch.  He has the privilege of representing
20 Patrice Machikas in connection with her
21 complaints of discrimination and retaliation.
22     I'm here today to ask you a series
23 of questions pertaining to this matter.  If at
24 any time, for any reason, you wish to take a

**Page 4**

1 break, please let me know and we will take a
2 break to suit your convenience.  I will only ask
3 that any then pending questions be answered
4 before we take a break.
5     Do you understand that?
6   A.  Yes, I do.
7   Q.  If there's any question that I ask you
8 that you don't understand, please let me know.
9 Please try to answer every question with a
10 verbal response as opposed to a nod of the head.
11     Do you understand that?
12   A.  Yes.
13   Q.  The most important instruction that I
14 can give you is that although this deposition is
15 being conducted in my office, it has the same
16 force and effect as if you were testifying in
17 federal court, before a federal judge and a
18 federal jury.  If you do not tell the truth, and
19 that would include saying you don't recall if
20 you do recall, and are convicted of that, that's
21 perjury and you can go to jail for that.
22     Do you understand that?
23   A.  Yes.
24   Q.  And I believe this is the first time in

1 (Pages 1 to 4)

Paul Mackenzie

**Page 5**

1  connection with these issues that are present in
2  this case that you are under oath. Am I correct
3  about that?
4       A.  I don't remember.
5       Q.  I don't believe that you submitted any
6  document under oath before today.
7       A.  I have not submitted any documents, but
8  I do not remember whether I was under oath when
9  I spoke in Jersey -- or, sorry, in Media.
10       MS. WALKER:  Correct, in Media.
11       THE WITNESS:  I do not remember.
12  BY MR. CONSOLE:
13       Q.  In Media?
14       A.  The place you --
15       Q.  At a mediation?
16       A.  Media.
17       MS. WALKER:  Media is a place.
18  Mediation was the event.
19  BY MR. CONSOLE:
20       Q.  I think we can all say when you speak at
21  a mediation, are you not under oath.
22       A.  Okay.
23       Q.  So this is the first time you are
24  providing any testimony under oath. You

**Page 6**

1  understand that?
2       A.  Yes.
3       Q.  And if you do not answer truthfully,
4  that's perjury. Do you understand that?
5       A.  Yes, I do.
6       Q.  Let's have this document marked as the
7  next, I think we are up to 65.
8       (P-65 was marked for
9  identification.)
10  BY MR. CONSOLE:
11       Q.  Mr. Mackenzie, I'm showing you a
12  document marked P-65. This is a letter from
13  Caren Gurmankin dated March 7th with an enclosed
14  subpoena.
15       A.  Uh-huh.
16       Q.  This document was served upon you;
17  correct?
18       A.  Yes.
19       Q.  And this document on Page 3, the first
20  page of the subpoena, asked you to bring certain
21  documents to this deposition.
22       Do you see where I'm referring to?
23       A.  Yes.
24       Q.  It asks for you to produce "all

**Page 7**

1  documents relating to or referring to your
2  employment with and/or termination from Condor
3  Automotive Group, LLC, and/or Mercedes-Benz of
4  Fort Washington, including, but not limited to,
5  all e-mail and other communications between you
6  and any employee or former employee of
7  defendants."
8       Do you see what I've read?
9       A.  Yes.
10       Q.  Have you brought any documents with you
11  today?
12       A.  Yes.
13       Q.  What documents have you brought?
14       A.  The documents I brought were exactly
15  what you asked for, any e-mails or anything that
16  happened.
17       Q.  Can you produce those, please.
18       A.  (Pause.)
19       Q.  Placed in front of you are the documents
20  you produced in response to the subpoena?
21       A.  Yes, they are.
22       Q.  Can I see those, please?
23       A.  (Witness complies.)
24       Q.  Let me identify these.

**Page 8**

1       The first is a November 13, 2009,
2  memo to Joann George, three pages long. Have I
3  identified that correctly, Mr. Mackenzie?
4       A.  You have.
5       Q.  The second is a two-page document
6  called "Interview Process."
7       Have I identified that correctly?
8       A.  You have.
9       Q.  The third is a three-page document
10  entitled "Regina Dunn and Andrew Mogilyansky."
11       Have I identified that correctly?
12       A.  You have.
13       Q.  Then the last is a two-page document
14  called "The Job Threat." Have I identified that
15  correctly?
16       A.  You have.
17       Q.  Where did you obtain these documents?
18       A.  These are documents that I sent.
19       Q.  Where did you find them to comply with
20  this subpoena?
21       A.  I kept copies of the documents, I wrote
22  them on my computer, so I accessed them from
23  copies of my computer.
24       Q.  Did you go on your computer?

2 (Pages 5 to 8)

Paul Mackenzie

| | |
|---|---|
| 1    A. Yes. | 1    preparing the first three pages of Exhibit P-46? |
| 2    Q. On your computer you still have | 2      MS. WALKER: Objection to the form. |
| 3    documentation relating to Condor? | 3      THE WITNESS: I don't quite |
| 4    A. That is the documentation I have. | 4    understand the question. Memos? |
| 5    Q. This is it? | 5    BY MR. CONSOLE: |
| 6    A. Correct. | 6    Q. Let me make sure I understand your |
| 7    Q. There are no other e-mails? | 7    answer. |
| 8    A. Correct. | 8      In preparing the first three pages |
| 9    Q. Or no e-mails at all? | 9    of P-46, I believe you say you accessed certain |
| 10   A. Correct. | 10   documentation on your computer? |
| 11   Q. This information that you produced has | 11   A. Uh-huh. |
| 12   previously been marked as Exhibit P-46. If you | 12   Q. Is that correct? |
| 13   can turn to Exhibit P-46 in the book. | 13   A. Correct. |
| 14     Am I correct, sir, that P-46 | 14   Q. I think you indicated that you accessed |
| 15   matches exactly the documents that you produced | 15   e-mails; is that correct? |
| 16   this morning? | 16   A. Yes. |
| 17   A. Yes. | 17   Q. Did you access anything else? |
| 18     Actually, there's one more page | 18   A. Anything I accessed would be a series of |
| 19   that you have -- I'm sorry. No, you don't. It | 19   notes or stuff that I put together from memory. |
| 20   matches. | 20   I have a habit of chronicling series of events |
| 21   Q. Everything's the same? | 21   at the workplace. So what I will do is I will |
| 22   A. Uh-huh. | 22   keep an open Word document and I'll add to it. |
| 23   Q. If you look off the Exhibit P-46, and we | 23   If it's something of significance that I think I |
| 24   can use that document because there's Bates | 24   should remember, then I will write it down. |
| Page 9 | Page 11 |
| 1    stamp numbers, the first page is 3750. Do you | 1    Q. Was it stored under a certain file name? |
| 2    see the number in the lower right-hand corner? | 2    A. Miscellaneous. |
| 3    A. Yes. | 3    Q. And did you access these notes to assist |
| 4    Q. That goes through 3752; correct? | 4    you in preparing the first three pages of |
| 5    A. Yes. | 5    Exhibit P-46? |
| 6    Q. When was this document prepared? | 6    A. Yes. |
| 7    A. I would say in the two or three days | 7    Q. Do you know how many pages of notes you |
| 8    before I sent it. | 8    had? |
| 9    Q. So some time in November of 2009? | 9    A. They would be line items, just maybe |
| 10   A. Yes. | 10   memory ticklers. So maybe a couple of pages. |
| 11   Q. Was this document prepared from looking | 11   Q. Am I correct that these notes would be |
| 12   at notes that you had or was this prepared from | 12   typed into your computer at or around the time |
| 13   memory? | 13   of the occurrence? |
| 14   A. This was prepared from both, and the | 14   A. They were from the very beginning. It's |
| 15   notes that I had at the time I had on my | 15   a memory jog for me. I usually have good recall |
| 16   computer at work. | 16   so I'll write a line, and as I read that line it |
| 17   Q. How were they stored on your computer at | 17   usually expands backwards and forwards in my |
| 18   work? | 18   mind and I remember the series of events. |
| 19   A. In a Word document on my desk, and I | 19   Q. Did you send a copy of these notes to |
| 20   would copy myself on e-mails, again, at the work | 20   your personal computer at home? |
| 21   address. | 21   A. I had thought that I did, but I couldn't |
| 22   Q. Putting aside the e-mails that you | 22   find anything on my home computer, but probably |
| 23   copied yourself on, did you also access some | 23   about six months ago I reread everything. I |
| 24   memos that you had prepared to assist you in | 24   don't remember seeing them at that time, but I |
| Page 10 | Page 12 |

3 (Pages 9 to 12)

Paul Mackenzie

**Page 13**

1  thought I sent them to myself. But I couldn't
2  find them at home and I'm very good at finding
3  things.
4      So maybe -- because I also got rid
5  of a lot of stuff on my computer. I bought a
6  new computer and I moved stuff over, so I may
7  have got rid of it.
8      Q. When did you get rid of stuff on your
9  computer at home?
10     A. I went to a digital copy of all of the
11 movies and stuff that I have, and I put my
12 office computer in my living room and I needed
13 the memory space, so I started just
14 housecleaning.
15     Q. When?
16     A. Probably about six months ago.
17     Q. Did you receive at any time any
18 notification from counsel for Condor that you
19 should not destroy any information that is
20 pertinent to this case?
21     A. No.
22     Q. Am I correct that about six months ago
23 you may have destroyed these notes that you used
24 to help prepare the document marked as P-46?

**Page 14**

1      MS. WALKER: Objection to the form.
2      THE WITNESS: I don't think so. I
3  think that's something I would have kept.
4  BY MR. CONSOLE:
5      Q. You believe that you did have these
6  notes?
7      A. Well, going back to, I think that's
8  something I would have copied myself on, but
9  going through my computer, looking for it, I
10 didn't find it. I have no memory of deleting
11 it, and it's probably something I wouldn't have
12 done anyway, so maybe I was just mistaken about
13 sending them to myself.
14     Q. When is the last time you looked at
15 these notes?
16     A. My recollection would be the last time I
17 actually remember seeing them was in the week
18 before I composed it.
19     Q. And P-46, did you compose this from
20 home?
21     A. No. I did this at work.
22     Q. Why did this end up on your home
23 computer?
24     A. Because I copied myself with an e-mail

**Page 15**

1  with this.
2      Q. Is it your testimony you believe you
3  also sent your notes to your home computer?
4      A. No. My testimony is I think I did, but
5  I'm just not sure.
6      Q. In any event, they should be at the
7  computer at work; is that correct?
8      MS. WALKER: Objection to the form.
9  BY MR. CONSOLE:
10     Q. In other words, when you were fired from
11 Condor, did you destroy those notes?
12     A. No, but I was informed, when I wanted
13 some personal information from my computer, that
14 they had erased the hard drive.
15     Q. Who told you that?
16     A. The IT gentleman.
17     Q. Who was that?
18     A. James Bell.
19     Q. When did he tell you that?
20     A. Probably about 10 days after I was
21 fired.
22     Q. After you were fired. What day were you
23 fired?
24     A. I don't remember.

**Page 16**

1      Q. Approximately?
2      A. March 1st. I'm sorry, it was March 1st.
3      Q. March 1st of 2010?
4      A. Yes. Yes.
5      Q. So after you're fired on March 1st, you
6  have a conversation with James Bell; correct?
7      A. Yes. About a week to ten days later,
8  just in casual, I said, "James, I believe
9  there's some stuff I have left on my computer,
10 personal stuff." That personal stuff being
11 things to do with my mother. And James said,
12 "Yeah, I don't think there's anything left on
13 your computer." I said, "Will you do me a favor
14 and check?" And he did. He said, "Yeah,
15 there's nothing left." "Could you save anything
16 that's important to me with regard to my
17 mother?" "There's nothing left." "Okay."
18     Q. Did he tell you that the hard drive had
19 been erased?
20     A. No. He said there's nothing left.
21     Q. What did you understand that to mean?
22     A. That the hard drive had been erased.
23     Q. In the hard drive would have been, in
24 addition to personal matters, these notes that

**TERRY BURKE REPORTING**

Paul Mackenzie

**Page 17**

1  you referred to earlier?
2      A. Yes.
3      Q. And they would have been a hard drive
4  stored on your file called miscellaneous?
5      A. Yes.
6      Q. And when you said there are line items,
7  would there be about 30 line items?
8          MS. WALKER: Objection to the form.
9          THE WITNESS: Maybe more.
10  BY MR. CONSOLE:
11      Q. After you were terminated, did you sign
12  a release agreement?
13      A. No.
14      Q. Were you offered a release agreement?
15      A. Yes.
16      Q. Did you keep a copy of that?
17      A. No.
18      Q. You just threw it away?
19      A. No. I refused to take it.
20      Q. You refused to accept it?
21      A. (Witness nods.)
22      Q. Why?
23      A. It was insulting.
24      Q. Why?

**Page 18**

1      A. A difficult question to answer, so give
2  me a second. Let me see if I can put it in
3  words.
4          In the course of my exit interview,
5  I was told alternatively that I was being laid
6  off, terminated, laid off. It went back and
7  forth between the two, and I thought it was
8  amusing. So I said, "You need to be very
9  careful about the terminology." And
10  Mr. Silverio said, "Well, now you're threatening
11  me with legal action so I can't talk to you any
12  more." So I said, "Okay, that's a huge leap.
13  I'm not threatening you with legal action. I
14  just find it amusing."
15          And he said, "Well, you're going to
16  take this money or you're not going to take this
17  money." I said, "No, I'm not going to take it."
18      Q. Is this a one-on-one meeting?
19      A. No. Joann George was there.
20      Q. What day was this?
21      A. The same day, so if March 1st fell on a
22  Monday.
23      Q. Is this the first time you heard you
24  were going to be fired?

**Page 19**

1      A. Yes.
2      Q. Who set up the meeting?
3      A. Mr. Silverio.
4      Q. Where was the meeting held?
5      A. In what was the general manager's office
6  in the rear of the showroom in Fort Washington.
7      Q. In the meeting, then, was you,
8  Mr. Silverio and Miss George?
9      A. Correct.
10      Q. Tell me everything that was said in this
11  meeting?
12      A. That Mr. Silverio was purchasing the
13  dealership. That the group of investors who
14  owned it, Park Avenue, were putting pressure on
15  him to perform up to the promises he and Carlos
16  Hoz de Vila had made to them, and they were only
17  going to let him purchase the dealership if he
18  cut costs, so he was taking over the dealership
19  as general manager, therefore, I was being laid
20  off.
21      Q. Anything else?
22      A. My response was, "Okay." His response
23  was, "We would like to offer you a severance
24  package," and he tried to hand me a piece of

**Page 20**

1  paper. And I said, without picking it up or
2  looking at it, "Tell me the gist of what your
3  severance package is." And I think he said
4  something along the lines of $5,000 a month —
5  I'm sorry, that's not correct.
6          What he said was — well, what you
7  have been earning over the last year, we'll give
8  you that for the next three months. So I did a
9  quick calculation in my head. I earned 210 the
10  year before, so I did the calculation. I said,
11  "So what you're offering me is an average salary
12  of, times three?" "Absolutely not, you're not
13  worth that, I'm not paying you that."
14          I said, "Then, what is the gist?"
15  He said, "I think it's $5,000 a month," at which
16  point I left and at which point I had decided
17  that I didn't really want any part of it.
18          Then the other conversation
19  happened, you're terminated, you're laid off,
20  you're terminated.
21      Q. What did he say, try to be as specific
22  as you can as to what was then said after you
23  rejected the severance offer?
24      A. I mentioned his math skills were

5 (Pages 17 to 20)

**TERRY BURKE REPORTING**

Paul Mackenzie

**Page 41**

1    A. Sansone, S-A-N-S-O-N-E.
2    Q. When was that?
3    A. It's got to be 15 years ago. Maybe
4 longer.
5    Q. What position did you hold there?
6    A. General manager.
7    Q. Where were you working immediately prior
8 to working for Condor?
9    A. Dealer Track.
10   Q. From when to when?
11   A. I don't remember, but I was still
12 actually working there when I went for the
13 interview, which was about a month before I was
14 hired, and I was probably only there four or
15 five months.
16   Q. So did you start at Dealer Track in
17 2008?
18   A. Yes.
19   Q. Would it have been the spring of 2008?
20   A. Yes.
21   Q. What position did you have?
22   A. It changed a couple of times. Maybe
23 district manager.
24   Q. Where were you working out of?

**Page 42**

1    A. My home.
2    Q. Where was that?
3    A. 300 Kennard Road.
4    Q. In what town?
5    A. Perkasie.
6    Q. That's where you currently reside?
7    A. Correct.
8    Q. What is Dealer Track?
9    A. It is a portal between a dealer and
10 banks, so basically what they do is you would
11 call your credit applications through the dealer
12 track system, who would send it to a bank and
13 keep the transaction secure, as well as
14 supplying the documents to execute a deal and
15 the storage of documents.
16   Q. Who were you reporting to?
17   A. Dave Kotfila.
18   Q. Did you know him before you started
19 there?
20   A. No.
21   Q. Did you resign from this position to —
22   A. Yes.
23   Q. — commence working with Condor?
24   A. Yes.

**Page 43**

1    Q. Before Dealer Track, was that Reedman
2 Toll?
3    A. Yes. But in between, whenever I was
4 unemployed — from the year that I left Reedman
5 Toll, for the next year, I didn't work at all.
6 I worked on a private project, personal project.
7 But before Reedman Toll, and two or three times
8 since then, I worked for different mortgage
9 companies that were all basically the same
10 company, but went through bankruptcies, name
11 changes. I may have worked, may have done some
12 consulting work for them. I would have to
13 check.
14   Q. What company are we talking about?
15   A. I think the last reincarnation of it was
16 JDS Mortgage Brokers, Inc.
17   Q. You worked for the various versions of
18 that company a total of how many years?
19   A. All in all, probably three years in
20 different spurts.
21   Q. You say that when you lost your position
22 at Reedman you were unemployed for a year?
23   A. Correct.
24   Q. So would that indicate that you last

**Page 44**

1 worked at Reedman some time in 2006?
2       MS. WALKER: Objection to the form.
3       THE WITNESS: I don't remember. I
4 thought it was 2005, but again, I'm just trying
5 to backtrack and fill in the numbers.
6 BY MR. CONSOLE:
7    Q. So it would have been 2005 or 2006 at
8 the latest?
9    A. I think so.
10   Q. And then you say for a year you weren't
11 employed, you were working on a project?
12   A. Correct.
13   Q. What project was that?
14   A. I wrote two books, so I took the year
15 off and I finished those two books.
16   Q. What types of books?
17   A. Fiction.
18   Q. Novels?
19   A. Yes.
20   Q. Were they published?
21   A. No.
22   Q. Did you have any income coming in during
23 that period?
24   A. No.

11 (Pages 41 to 44)

Paul Mackenzie

| | |
|---|---|
| 1 a GSM at Mercedes-Benz Fort Washington with | 1    Q.  Did you think he was instructing you |
| 2 anyone? | 2 that you were not able to fire her? |
| 3    A.  Yes.  The guy who ended up being the | 3    A.  Yes. |
| 4 general sales manager. | 4    Q.  Did he tell you why? |
| 5    Q.  That's David Reedman? | 5    A.  Later he did, but at that particular |
| 6    A.  Correct. | 6 point in time, no. |
| 7    Q.  When did you first discuss with David | 7    Q.  At some point he did tell you why? |
| 8 Reedman the possibility of being a GSM in Fort | 8    A.  Yes. |
| 9 Washington? | 9    Q.  What did he tell you was the reason why |
| 10    A.  Before I met Carlos Hoz de Vila, so | 10 he couldn't fire her? |
| 11 probably the week before that I met him for | 11    A.  That she had filed suit against the |
| 12 lunch and I asked him -- I told him, "I have | 12 company, against him personally.  They had to |
| 13 nothing, I don't have a job offer.  I have a | 13 get mediators there, and someone came down and |
| 14 possibility."  "Should the possibility arise and | 14 questioned everybody and it probably wouldn't be |
| 15 I need a general sales manager, would you be | 15 a good idea to fire her. |
| 16 willing to talk about it?" | 16    Q.  When did you first learn that a female |
| 17       "Where, when, when can I start?" | 17 had made a complaint of sex discrimination at |
| 18 None of the above.  "I'm not going to tell you | 18 Condor? |
| 19 where it is, because I don't even have a job. | 19    A.  I don't think I was ever told by anyone |
| 20 I'm just asking, would you be?" | 20 at Condor, from Steve or Carlos for quite a few |
| 21    Q.  And what was his response? | 21 months. |
| 22    A.  He had been at the same place since he | 22       The issue with Regina got to me |
| 23 was 18, so he had been at the same place for 35 | 23 through the salespeople on the showroom floor. |
| 24 years and he needed to think about it. | 24    Q.  Who was the first person who told you |
| Page 105 | Page 107 |

| | |
|---|---|
| 1    Q.  Generally positive? | 1 that Regina Dunn had made a complaint of sex |
| 2    A.  I would say so. | 2 discrimination? |
| 3    Q.  What made you reach out to him? | 3    A.  I don't remember his name.  The young |
| 4    A.  Standard operating procedure.  If you go | 4 man drives a Lotus. |
| 5 into a dealership, most of the time you will go | 5    Q.  Dru Marks? |
| 6 in and fire people.  I mean that's -- if you | 6    A.  No. |
| 7 have to do things quickly, you either change the | 7    Q.  What was his position? |
| 8 culture or you bring in people who know your | 8    A.  He was a salesperson. |
| 9 culture already and what you want to do.  It's | 9    Q.  What did he say to you? |
| 10 unfortunately commonplace in our industry. | 10    A.  That he had heard that Regina had filed |
| 11    Q.  You had discussions with Silverio about | 11 a sexual harassment suit against the company. |
| 12 the concept of having the ability to hire and | 12    Q.  When you heard of this, was Regina still |
| 13 fire people as you saw fit; correct? | 13 employed? |
| 14    A.  No.  Cast iron assurance that I could. | 14    A.  No. |
| 15    Q.  That you could. | 15    Q.  Is it your testimony that you did not |
| 16       But you also had a discussion with | 16 know that Regina had made a complaint before you |
| 17 him about the issue of Regina Dunn in | 17 fired her? |
| 18 particular; correct? | 18    A.  That's not my testimony.  My testimony |
| 19    A.  Before? | 19 is that I didn't know it was a sexual |
| 20    Q.  Before you were offered the job? | 20 harassment.  It was presented to me that it was |
| 21    A.  Oh, yes, from the perspective of, yes, | 21 a harassment suit because she was a woman. |
| 22 what's going to happen. | 22    Q.  Who presented that to you? |
| 23    Q.  And he's saying work it out? | 23    A.  Mr. Silverio. |
| 24    A.  Yes. | 24    Q.  So when did you first learn that |
| Page 106 | Page 108 |

27 (Pages 105 to 108)

TERRY BURKE REPORTING

Paul Mackenzie

| | |
|---|---|
| 1  Miss Dunn had made a harassment complaint | 1  and, "You can't do that.  This is the reason |
| 2  because she's a woman? | 2  why."  That's when he presented to me that she |
| 3      A.  Probably about a week into the job. | 3  was suing him for discrimination because she's a |
| 4      Q.  Who did you hear that from? | 4  woman.  Mentioned nothing about a sexual |
| 5      A.  Mr. Silverio.  There were too many | 5  harassment suit and all. |
| 6  rumors going around and he confronted me and he | 6      Q.  What was your response? |
| 7  told me. | 7      A.  I'm usually a very calm person, but I |
| 8      Q.  But before you confronted him you heard | 8  was not calm and I ripped into him. |
| 9  rumors? | 9      Q.  What did you do?  What did you say? |
| 10     A.  Yes. | 10     A.  "You lied to me.  Plain and simple, you |
| 11     Q.  When did you first hear rumors? | 11  lied to me.  What else have you lied to me |
| 12     A.  Day 1. | 12  about?  You lied to me.  You put me in a |
| 13     Q.  Who did you hear the rumors from? | 13  position that, now what am I supposed to do?" |
| 14     A.  Salespeople. | 14     Q.  What did he say? |
| 15     Q.  What were they saying? | 15     A.  "You're a big boy.  You'll figure a way |
| 16     A.  Oh, I think in an effort to protect | 16  out."  "Out of what?"  "Make it work.  She's |
| 17  themselves, and most salespeople tend to think | 17  good, make it work." |
| 18  it's a good idea to distance themselves from the | 18     Q.  Anything else? |
| 19  previous regime so they're not associated with | 19     A.  No. |
| 20  it so they don't get fired.  So even if the | 20     Q.  Am I correct that as of that |
| 21  previous regime was the world's best sales team, | 21  conversation you had not decided to fire |
| 22  they'll still say they are awful, they're | 22  Miss Dunn? |
| 23  terrible, because they are not there for a | 23     A.  Correct. |
| 24  reason.  So in conversations in my first day I | 24     Q.  Did you decide to fire Miss Dunn at some |
| Page 109 | Page 111 |

| | |
|---|---|
| 1  sat with every single salesperson, and from that | 1  point in time? |
| 2  day some of them said things along the lines of, | 2      A.  Yes. |
| 3  "Well, Regina's next, when are you going to fire | 3      Q.  When did you first decide to fire |
| 4  her?"  I said, "I'm not." | 4  Miss Dunn? |
| 5      Well, even though it was that kind | 5      A.  The day that she -- when I considered |
| 6  of thing, even though she's suing the company, | 6  she put the dealership in huge danger and lied |
| 7  and it was kind of like, okay, maybe that's a | 7  to me about a car. |
| 8  rumor, maybe it's true.  I don't know.  I just | 8      Q.  How long after this conversation with |
| 9  went about my business.  I went to the | 9  Silverio was it? |
| 10  dealership and when the rumors didn't stop I | 10     A.  Three, four days. |
| 11  confronted Steve. | 11     Q.  Describe the situation that you just |
| 12     Q.  So within a week you confronted | 12  referenced? |
| 13  Silverio? | 13     A.  The gentleman who was exporting cars, |
| 14     A.  Uh-huh. | 14  Andrew Mogilyansky, had traded in a car from a |
| 15     Q.  Yes? | 15  dealership that he had some kind of association |
| 16     A.  Yes.  I'm sorry. | 16  with.  One of the first things I do is I send |
| 17     Q.  Where was that? | 17  someone out to check it.  Bring me back a report |
| 18     A.  On the showroom floor. | 18  on every single car, I want to know what every |
| 19     Q.  What did you say to him? | 19  car is, who owns it, if that car's been there |
| 20     A.  I actually said, "I'm going to fire | 20  three weeks and it should have gone out, I want |
| 21  Regina today."  That's how I started the | 21  to know everything. |
| 22  conversation.  Which wasn't true, but I just | 22     So there was a car that was a |
| 23  needed to shake him a little bit.  So he said, | 23  trade.  The whole deal just didn't make sense. |
| 24  "Let's go back."  He took me back to the office | 24  So I asked Regina to explain it to me. |
| Page 110 | Page 112 |

28 (Pages 109 to 112)

Paul Mackenzie

```
 1          And it was a trade, but it wasn't a
 2    trade.  We just did a paperwork trade and we did
 3    it so we could get a rebate on a car so this
 4    gentleman could buy the car.  He's driving this
 5    car.  And I checked that car and that car was
 6    still on that floor plan so we hadn't sold him
 7    that car.  Something was just bad.
 8          So I asked Regina to tell me
 9    everything, and she pretty much denied knowing
10    anything about it.  "Speak to Steve Silverio,
11    speak to Steve Silverio."
12          I then followed the paper trail.  I
13    went up to my office, and I told the office
14    manager, Michelle Tyler, to keep an eye on this
15    car.  Don't do anything with it, but if anybody
16    brings up any paperwork about this car, then you
17    need to let me know immediately, the next day.
18          She said to me, Regina is asking us
19    to send the title of this car back or to issue a
20    check for the car, because no money changed
21    hands to Haverstraw Mitsubishi.
22          I still wasn't sure what was going
23    on.  All I knew now was that Regina had lied to
24    me, she did know about the car because she's the
                                          Page 113
```

```
 1    one who put in the request and she never -- she
 2    didn't go through me and ask me to do it or tell
 3    me what was happening.  She didn't tell me.
 4       Q.  She didn't tell you what?
 5       A.  That she was putting through this
 6    request for the title.
 7       Q.  After you met with her?
 8       A.  After I met with her and said "What's
 9    the story with this car?"
10       Q.  Right.
11       A.  "I don't know anything about it."
12       Q.  But then after you met with her, she
13    then took action?
14       A.  Yes.
15       Q.  And had you instructed her not to take
16    action?
17       A.  No.
18       Q.  So what was wrong with her taking
19    action?
20       A.  I told her, "Tell me everything, tell me
21    everything," was my opening statement to pretty
22    much everyone there.  "What are we facing here?
23    Tell me everything."
24       Q.  How did her action the following day or
                                          Page 114
```

```
 1    two with Michelle Tyler indicate to you that she
 2    hadn't told you everything?
 3       A.  Because she bypassed me as the general
 4    manager of the store.  Everything goes through
 5    me.  I told her that as well.  Everything goes
 6    through me.  And she bypassed that, she
 7    deliberately did not do that and instead went to
 8    the office and said --
 9       Q.  Did Silverio know what she was doing?
10       A.  I don't think so.
11       Q.  Did you ask Silverio?
12       A.  I did.
13       Q.  What did he say?
14       A.  "Yes, it's a problem, it's a problem."
15       Q.  What's a problem?
16       A.  That she had bypassed me.
17       Q.  Did you tell her then, don't bypass me
18    in the future?
19       A.  Yes.
20       Q.  So the problem you had was she bypassed
21    you; correct?
22       A.  Correct.
23       Q.  What did she say when you said, "Don't
24    bypass me in the future?"
                                          Page 115
```

```
 1       A.  "Okay."
 2       Q.  Is there anything else about this issue?
 3       A.  Yes.  Then I started to delve into the
 4    deal and I found out that this car had been used
 5    as a paper trail.  We had represented, the
 6    dealership had represented to Mercedes-Benz USA
 7    that they had in fact taken a car in on trade,
 8    which then allowed a certain amount of money
 9    against that car, but the trade was just on
10    paper and never actually happened.
11       Q.  This was done with the knowledge of
12    Mr. Silverio, wasn't it?
13          MS. WALKER:  Objection to the form.
14          THE WITNESS:  I have always been
15    told by Mr. Silverio he had no knowledge of it;
16    because once it unraveled and I told him this is
17    what I found and this is what happened, he took
18    the stance of, yeah, I didn't know anything
19    about it.
20    BY MR. CONSOLE:
21       Q.  Did you ever ask Miss Dunn as to whether
22    or not she was advised to do this by either
23    Mr. Esposito, Mr. Silverio, or anyone else?
24       A.  When I asked her about why she sent the
                                          Page 116
```

29 (Pages 113 to 116)

**TERRY BURKE REPORTING**

Paul Mackenzie

**Page 117**

1　paperwork to the office, she refused to answer
2　me. She answered me, but she refused to answer
3　the question. It was just dancing.
4　　Q. What did she say?
5　　A. I don't know. I don't remember. I
6　don't know what you're talking about. But her
7　signature was on the paperwork so she sent it
8　through.
9　　Q. But the issue in question as far as this
10　car, you say that you think there was something
11　inappropriate done in connection with this
12　vehicle; correct?
13　　A. Correct.
14　　Q. And that something inappropriate was
15　done before you were hired; correct?
16　　A. Correct.
17　　Q. And that something that was
18　inappropriate that was done, was that done
19　because Mr. Silverio authorized it?
20　　　MS. WALKER: Objection to the form.
21　BY MR. CONSOLE:
22　　Q. Do you know?
23　　A. I do not know.
24　　Q. Was it done because Mr. Esposito

**Page 118**

1　authorized it?
2　　A. I do not know.
3　　Q. It was a trade-in; correct?
4　　A. Yes.
5　　Q. And who was in charge of the trade-ins
6　at Mercedes-Benz Fort Washington as of that
7　point in time?
8　　A. Okay. Who's in charge of appraising a
9　trade would have been Brian, which means if the
10　salesperson wants a number put on a trade, what
11　is this car worth, and Brian would have been the
12　person or Dru Marks, if he was there. I'm sure
13　Joe Esposito and Regina both had the authority
14　to look at the trade and put a number on it.
15　　　When it comes to taking the
16　particulars on the trade and committing it to
17　paper, that would be every single salesperson,
18　along with the managers, Regina and Joe,
19　whoever, or Tom Palmer, or whoever they give
20　power to that says, "Yes, I have checked this
21　deal, yes, this is all correct, here's my
22　signature."
23　　Q. And what car was this?
24　　A. I don't remember.

**Page 119**

1　　Q. And who was responsible for the trade-in
2　initially of this car, of all those people
3　you've mentioned, who was responsible?
4　　A. I would imagine that would be the
5　salesperson, if there was a salesperson attached
6　to it, or it would have been Regina or Joe.
7　　Q. Could it have been Brian?
8　　A. Yes. I wasn't there.
9　　Q. Could it have been Dru Marks?
10　　A. It could have been anyone.
11　　Q. Did you ever determine who was actually
12　responsible for this trade-in you didn't think
13　was appropriate?
14　　A. Yes.
15　　Q. And who did you determine?
16　　A. Regina.
17　　Q. How did you determine that?
18　　A. Andrew Mogilyansky.
19　　Q. Andrew Mogilyansky told you?
20　　A. Uh-huh.
21　　Q. When did he tell you that?
22　　　MR. TINARI: Is that a yes?
23　　　THE WITNESS: That's a yes.
24　　Probably within the next week.

**Page 120**

1　BY MR. CONSOLE:
2　　Q. Didn't Mogilyansky also tell you that
3　Silverio knew everything that was going on?
4　　　MS. WALKER: Objection to the form.
5　　　THE WITNESS: No.
6　BY MR. CONSOLE:
7　　Q. He didn't tell you that?
8　　　MS. WALKER: Objection to the form.
9　　　MR. TINARI: Objection.
10　　　MS. WALKER: Argumentative.
11　　　MR. CONSOLE: It is not
12　argumentative. There's nothing wrong with the
13　form.
14　　　THE WITNESS: No, he never, to me.
15　He always claimed that he had no knowledge.
16　BY MR. CONSOLE:
17　　Q. Who is the "he" here?
18　　A. The "he," being Steve Silverio.
19　　Q. Silverio?
20　　A. Correct.
21　　Q. Did you ever ask Mogilyansky if Silverio
22　had knowledge of this transaction?
23　　A. I didn't need to. He told me he did.
24　　Q. Who told you he did?

30 (Pages 117 to 120)

Paul Mackenzie

| | |
|---|---|
| 1    A. Mr. Mogilyansky told me Steve Silverio | 1    was my opinion after talking to her, asking her |
| 2    knew what was going on. | 2    questions, watching her work.  It was my opinion |
| 3    Q. Did you ever ask Miss Dunn if Silverio | 3    that she didn't want to be there any more? |
| 4    knew what was going on? | 4    Q. She was demoralized? |
| 5    A. I don't think so. | 5    MS. WALKER:  Objection to the form. |
| 6    Q. Why not? | 6    MR. DENGLER:  Objection to the |
| 7    A. Because my conversations with | 7    form. |
| 8    Mr. Mogilyansky happened after I found out about | 8    THE WITNESS:  I don't think I know |
| 9    the car, and I had already made up my mind that | 9    her well enough to know whether she was |
| 10   if you lied to me, I don't want you working for me. | 10   demoralized.  She was unhappy. |
| 11   Q. And what is the lie? | 11   BY MR. CONSOLE: |
| 12   A. The lie was that she didn't know | 12   Q. Any other reason as to why you concluded |
| 13   anything about the car that Mr. Mogilyansky fake | 13   to fire her other than you concluded that she |
| 14   traded to get money out of Mercedes-Benz. | 14   lied and you concluded that she didn't want to |
| 15   Q. And Silverio also told you he didn't | 15   be there any more? |
| 16   know anything about the car? | 16   A. No. |
| 17   A. Correct. | 17   Q. You already testified to the |
| 18   Q. He lied to you also? | 18   conversation where you told Mr. Silverio but you |
| 19   MR. TINARI:  Objection. | 19   weren't telling the truth that you wanted to |
| 20   MR. DENGLER:  Objection. | 20   fire Miss Dunn. |
| 21   BY MR. CONSOLE: | 21   A. Uh-huh. |
| 22   Q. According to Mogilyansky he knew; right? | 22   Q. Did you then have another conversation |
| 23   MS. WALKER:  Objection to form. | 23   with Mr. Silverio where you told him that you |
| 24   MR. DENGLER:  Objection. | 24   wanted to fire her? |
| **Page 121** | **Page 123** |

| | |
|---|---|
| 1    MR. TINARI:  Objection. | 1    A. Yes. |
| 2    THE WITNESS:  Mr. Mogilyansky did | 2    Q. When was the next conversation that you |
| 3    say Silverio knew what was going on.  As a | 3    had along those lines? |
| 4    blanket statement I didn't ask him if he knew. | 4    A. I would say about a week later, because |
| 5    Mr. Mogilyansky's blanket statement was that | 5    I had two conversations with Mr. Mogilyansky at |
| 6    Steve Silverio knew what was going on with the | 6    that point.  And in that week to ten-day period, |
| 7    dealership with the exports. | 7    that's when it was quite obvious to me that |
| 8    BY MR. CONSOLE: | 8    Regina didn't want to be there, so at that point |
| 9    Q. In connection with this vehicle, was | 9    in time, I made Mr. Silverio live up to his |
| 10   there any financial penalty paid by | 10   words to me I have control, I have control.  I |
| 11   Mercedes-Benz Fort Washington? | 11   have a pay plan that's based on what I produce. |
| 12   A. There could have been. | 12   I have control.  This is my decision, I want to |
| 13   Q. Was there? | 13   make this happen.  How do I do it? |
| 14   A. Not until the point -- actually, that's | 14   Q. What did he say? |
| 15   not true.  You know, I have never checked it. | 15   A. That's when he told me that it would be |
| 16   There were massive chargebacks, massive.  Almost | 16   bad for him if he filed suit, it would look |
| 17   a million dollars, I think.  It may have been | 17   bad.  They had enough problems.  Basically try |
| 18   one of the cars on there.  I don't know. | 18   to guilt me, plead me into not doing it.  So I |
| 19   Q. In connection with your decision to fire | 19   said to him, "You take over the dealership.  I'm |
| 20   Miss Dunn, was that the only reason why, that | 20   done." |
| 21   is, you concluded that she had lied to you? | 21   MR. TINARI:  I'm sorry? |
| 22   A. No. | 22   THE WITNESS:  "You take over the |
| 23   Q. What other reasons were there? | 23   dealership.  I'm done.  You tied my hands behind |
| 24   A. Regina didn't want to be there any more, | 24   my back.  I can't make money.  I can't make |
| **Page 122** | **Page 124** |

31 (Pages 121 to 124)

Paul Mackenzie

**Page 125**

1  progress."
2       And he said, "Okay, I'll speak to
3  Vince and Carlos about it."
4  BY MR. CONSOLE:
5       Q.  Did you tell him why you wanted to fire
6  her?
7       A.  Probably.
8       Q.  Do you recall that or are you just
9  guessing it?
10      A.  Yeah.
11      Q.  What did you tell him?
12      A.  About the car and the fact that she
13  spends three hours a day walking around the
14  dealership outside on the phone.  I questioned
15  her about it, and she said she was talking to
16  her nanny.  It would end soon.  She was sorry.
17  She had just moved.  Something to do with a
18  nanny, getting a good nanny.  Which I would have
19  worked with.  You can tell when someone doesn't
20  want to be somewhere.
21      Q.  You knew there were rumors about her
22  throughout the dealership; correct?
23      A.  Uh-huh.
24      Q.  Yes?

**Page 126**

1       A.  Yes.
2       Q.  Did you understand that if she heard of
3  these rumors it would be upsetting to her?
4       MS. WALKER:  Objection to the form.
5       MR. TINARI:  Objection.
6       THE WITNESS:  Shame on me I didn't
7  think about it.
8  BY MR. CONSOLE:
9       Q.  Do you agree with me as general manager
10 that if you have a female general sales manager
11 and the people on the floor are talking about
12 her bringing a complaint against the company,
13 that could demoralize that woman?
14      MS. WALKER:  Objection to the form.
15      MR. TINARI:  Objection.
16      THE WITNESS:  Yes, it could.
17 BY MR. CONSOLE:
18      Q.  Did you speak to Miss Dunn about the
19 issue of her morale?
20      A.  No.  My observations on morale was after
21 I found out about the car, so my decision was
22 already made.
23      Q.  So for the first couple of weeks you
24 didn't have a problem with her morale; is that

**Page 127**

1  right?
2       A.  It is hard to quantify.  From her
3  position she's lost a general manager that she
4  came to work for.  I am in a new job.  I have 27
5  other things to do.  So does she.  I can't
6  honestly say I was tuned into looking at her
7  morale.  My thought process is if I'm her, I'm
8  doing everything I can to impress this general
9  manager because I want to keep this job.
10      Q.  Did anyone tell you that she had sent a
11 written letter to Carlos Hoz de Vila on
12 August 5th complaining of discrimination?
13      A.  After the last conversation with Steve
14 that I'm going to do this, make it happen, and
15 he said he would talk to Carlos and Steve, Vince
16 told me that in a meeting probably a day, two
17 days later.
18      Q.  Is that the next contact you had with
19 anyone about terminating Miss Dunn?
20      A.  Yes.
21      Q.  Who is in that meeting?
22      A.  Vince, Carlos and Steve.
23      Q.  What is said in that meeting?
24      A.  I think it started out because it's a

**Page 128**

1  statement meeting, which means basically we have
2  gone over the statements, the Blue Book, to look
3  at what we have done against projections.  It's
4  the end of the year, so new projections need to
5  be made for next year and they're asking me for
6  my input.
7       And my basic response was, "Okay,
8  with Regina or without Regina?"  That's how I
9  broached the subject and I told him --
10      Q.  What did you tell him?
11      A.  It's not working.  It's not working.  I
12 can't move this dealership forward unless I
13 bring in the people I need to bring in.  That's
14 my decision.  That's what we want to do.  How do
15 we accomplish that?
16      Q.  What did they say?
17      A.  They all looked at each other, and Vince
18 said, "You are aware of the situation we have
19 with Regina?"  And I said, "No.  I hear a lot,
20 but no one's actually told me anything, so tell
21 me."  And that's when he told me.
22      Q.  What did he tell you?
23      A.  That she filed suit against the company,
24 against Steve, that someone had come in.  There

32 (Pages 125 to 128)

Paul Mackenzie

**Page 129**

was mediation, questions. I don't even think then a sexual harassment. I certainly think I would have remembered that. I don't even think then that they told me she had filed a sexual harassment suit. It was just a lawsuit about discrimination because she's a woman.

Q. What else was said in this meeting?

A. They looked at each other and I think Carlos said, "Well, if that's what he wants to do, he has the right to do it. So Vince, speak to an attorney, get Paul involved and walk him through the process of what he has to do."

Q. In that meeting, did you tell him why you wanted to fire Miss Dunn?

A. Yes.

Q. What did you tell him?

A. That I can't trust her and she doesn't want to be here and that's not going to change.

Q. Did anybody in that meeting discuss with you the fact that Miss Dunn had in her written complaint referenced, among other things, that males in the showroom were calling her a cunt and a bitch?

A. No, I don't think I even found out about

**Page 130**

that letter. I don't think I ever read anything. I'm not even sure if I read it, but at the -- when I went to mediation in Media.

Q. Did anybody ever tell you that Mr. Silverio, when he found out that she had made the written complaint, told Mr. Esposito to put a choke hold on that dumb bitch?

MR. DENGLER: Objection to the form.

MS. WALKER: Objection to the form.

MR. CONSOLE: You can object all you want. You know it's the testimony. Everybody in this room knows it's the testimony.

BY MR. CONSOLE:

Q. Did anybody tell you about it?

A. No.

Q. Did anybody tell you that Miss Dunn felt that she was being undermined in her position as general sales manager because she's a woman?

A. No.

Q. You said you told these people you were going to bring your people in, that's what you said.

A. Uh-huh.

**Page 131**

Q. Who were the people you were going to bring in?

A. David Reedman.

Q. Who else?

A. Tony Lukanski. Rich Gambone, but it actually turned out that he actually started the same day as I did, service manager.

Casey Taylor, who never ended up taking the job there. And Ray Costa, who did.

Q. As of this conversation you had with Petruzziello and Hoz de Vila and Silverio, had you reached back and spoken to Reedman about coming on board as a GSM?

A. Yes. In fact, he was going through his own issues. He pretty much called me every two or three days since the first time I said I may have -- would be interested.

Q. When was Reedman offered the job?

A. Probably after my first week there, after the incident about the car.

Q. Was Reedman offered the job before you got authorized to fire Dunn?

A. Yes.

Q. So you offered him the job?

**Page 132**

A. Yes.

Q. Did he accept?

A. Pursuant to us coming to terms on a pay plan.

Q. When was this in relation to your start date?

A. I'd say about ten days, a week to ten days after.

Q. Did you tell Silverio that you had offered the job to Reedman?

A. No.

Q. Why not?

A. I am pretty pissed at this time.

Q. Pretty pissed at who?

A. Mr. Silverio.

Q. Why?

A. Shouldn't have to ask. I shouldn't have to ask to fire someone. I shouldn't have to ask to do anything. It's not the way I work and I was very clear when I started.

MS. WALKER: Can we take a comfort break?

MR. CONSOLE: Sure.

MS. WALKER: Thank you.

33 (Pages 129 to 132)

**TERRY BURKE REPORTING**

Paul Mackenzie

**Page 133**

```
 1              (Recess.)
 2    BY MR. CONSOLE:
 3         Q.  I think we left off with the meeting
 4    that you had with Petruzziello, Hoz de Vila and
 5    Silverio.  Where was that meeting held?
 6         A.  Conference room, Mercedes-Benz of Fort
 7    Washington.
 8         Q.  When you said that you didn't think
 9    Regina wanted to be at the dealership, did they
10    respond in any way to that?
11         A.  I don't think so.
12         Q.  Do you agree that if Regina, in the
13    first 30 days of your employment at
14    Mercedes-Benz of Fort Washington, if she had
15    conveyed to you that she was enthusiastic and
16    really wanted to be at the dealership, that you
17    would have not decided to terminate her?
18         MS. WALKER:  Objection to the form.
19         THE WITNESS:  I'm sorry, if she had
20    performed and was energetic, I would not have
21    fired her?
22    BY MR. CONSOLE:
23         Q.  I'm focusing in on the issue of her
24    morale or her attitude, and my question is, if
```

**Page 134**

```
 1    she had within those first few weeks of your
 2    employment shown an enthusiastic, vibrant, happy
 3    approach to the job, do you agree that you would
 4    not have recommended her termination at that
 5    time?
 6         MS. WALKER:  Objection to the form.
 7         THE WITNESS:  If she had been
 8    honest with me about the car in conjunction with
 9    that, yes.
10    BY MR. CONSOLE:
11         Q.  Are you saying regardless of her
12    attitude she wouldn't have been fired just
13    solely on the car issue?
14         A.  No.
15         Q.  So you agree with me that if she had a
16    better attitude in those first few weeks you
17    would not have recommended at that time that she
18    be terminated?
19         MR. TINARI:  Objection.
20         MS. WALKER:  Objection to the form.
21         MR. DENGLER:  Same objection.
22         THE WITNESS:  Correct.
23    BY MR. CONSOLE:
24         Q.  Have you told me everything you recall
```

**Page 135**

```
 1    being said in that meeting with Hoz de Vila,
 2    Silverio and Petruzziello?
 3         A.  I think so.
 4         Q.  What's the next communication you had
 5    with anyone about the issue of terminating
 6    Regina Dunn?
 7         A.  Either that day or the following day,
 8    Vince called me to his office.  He had an
 9    attorney on the other end of the line.  He made
10    me repeat what I told them and my reasons for
11    doing it.  And then said okay, then do it, but
12    either Carlos or Vince needed to be in the
13    meeting and Steve Silverio was not to be in the
14    building.
15         Q.  What did you tell the attorney?  Is that
16    James Kilcur, by the way?
17         A.  It sounds familiar.
18         Q.  Whoever the attorney was, what did you
19    tell him in that phone call?
20         A.  Pretty much what I've told you, that --
21    I don't think I went into the details.  I think
22    I just mentioned from a business practice point
23    of view I had seen things done that I wouldn't
24    stand for and I'm dealing with a person who
```

**Page 136**

```
 1    doesn't want to be here.  I then voiced again my
 2    objection to having to go through any of this.
 3    I don't think I was specific about the car, and
 4    he said okay.
 5         Q.  Did he ask you whether or not you were
 6    aware of the fact that Miss Dunn had made a
 7    complaint about discrimination in the workplace?
 8         MR. DENGLER:  Objection to the
 9    form.
10         THE WITNESS:  His actual phrasing
11    of it was somewhere along the lines of, "You are
12    aware of the fact that," and my response was,
13    "I'm aware of what Vince has told me, Vince and
14    Steve have told me," and Vince followed it up by
15    saying he's aware.
16    BY MR. CONSOLE:
17         Q.  Just so the record is clear, when Kilcur
18    says "you're aware of the fact that," do you
19    then finish the sentence?
20         A.  That she has a complaint, an official
21    complaint against them.
22         Q.  And you indicated you were aware of
23    that?
24         A.  Yes.
```

34 (Pages 133 to 136)

**TERRY BURKE REPORTING**

Paul Mackenzie

| | |
|---|---|
| 1      A.  No. | 1      Q.  Does this refresh your recollection that |
| 2      Q.  As part of the process of terminating an | 2   when you filled out the termination report you |
| 3   employee, was a termination report to be filled | 3   backdated it? |
| 4   out? | 4      A.  I would say yes, but it doesn't refresh |
| 5      A.  Handled by HR, yes. | 5   my recollection, but I would say that's probably |
| 6      Q.  Turn to Exhibit P-39, please. | 6   what happened. |
| 7          Exhibit P-39 is a one-page | 7      Q.  Do you agree that that's dishonest? |
| 8   termination report for Regina Dunn dated | 8          MS. WALKER:  Objection to the form. |
| 9   November 3rd, 2006.  Have I identified that | 9          THE WITNESS:  No. |
| 10   correctly? | 10   BY MR. CONSOLE: |
| 11      A.  You have. | 11      Q.  It's not?  It's not dishonest to put the |
| 12      Q.  Does your signature appear at the bottom | 12   wrong date on a document that you sign? |
| 13   of the page? | 13          MS. WALKER:  Objection to the form. |
| 14      A.  My handwriting too. | 14          MR. DENGLER:  Same objection. |
| 15      Q.  I'm sorry, and your handwriting too? | 15          THE WITNESS:  No. |
| 16      A.  Correct. | 16   BY MR. CONSOLE: |
| 17      Q.  So next to the signature there's a date | 17      Q.  Why the no? |
| 18   of 11-3-06; is that right? | 18      A.  It's paperwork. |
| 19      A.  Correct. | 19      Q.  So you can lie on paperwork? |
| 20      Q.  And are you the one who did the check | 20          MS. WALKER:  Objection to the form. |
| 21   marks here? | 21   BY MR. CONSOLE: |
| 22      A.  I would say yes, except for the bottom. | 22      Q.  You can put false dates on paperwork, |
| 23      Q.  Except for the bottom where it says "for | 23   that's okay with you? |
| 24   office use only"? | 24      A.  The answer's not going to change. |
| **Page 141** | **Page 143** |

| | |
|---|---|
| 1      A.  Correct. | 1          MS. WALKER:  Objection to form. |
| 2      Q.  Did you fill this document out and sign | 2          THE WITNESS:  I don't think it's |
| 3   it on November 3rd, 2006? | 3   dishonest.  I think it's just paperwork.  I'm |
| 4      A.  I would say yes. | 4   filling it out, I'm lining everything up. |
| 5      Q.  You wouldn't put a false date there, | 5   BY MR. CONSOLE: |
| 6   would you? | 6      Q.  But you're putting the wrong date down |
| 7      A.  No. | 7   next to your signature; right? |
| 8      Q.  Can you turn to Exhibit P-40, please. | 8          MS. WALKER:  Objection to the form. |
| 9   Exhibit P-40 appears to be an e-mail chain from | 9          THE WITNESS:  Correct. |
| 10   November 5th, 2006.  It has first an e-mail from | 10   BY MR. CONSOLE: |
| 11   Marion Maurer to Joann George referencing | 11      Q.  In terms of the employee evaluation, did |
| 12   Regina, November 8th at three o'clock, 3:06 p.m. | 12   you put in those check marks? |
| 13   Then an e-mail from Joann George to Marilyn | 13      A.  Yes. |
| 14   Maurer and you, is November 5th, 2006, at 3:11 | 14      Q.  Are they also false? |
| 15   p.m. | 15      A.  Yes. |
| 16      Do you see that? | 16      Q.  So the only thing that's false on this |
| 17      A.  I do. | 17   document is the date you signed? |
| 18      Q.  Does this e-mail indicate that as of the | 18          MS. WALKER:  Objection to the form. |
| 19   time you received the e-mail you had not yet | 19   BY MR. CONSOLE: |
| 20   signed the termination report? | 20      Q.  Is that your testimony? |
| 21          MS. WALKER:  Objection to the form. | 21      A.  Correct. |
| 22   BY MR. CONSOLE: | 22      Q.  Now, you say that Miss Dunn here, |
| 23      Q.  You can answer. | 23   looking at these employee evaluation boxes, |
| 24      A.  I would say yes. | 24   management skills, you put "unsatisfactory." |
| **Page 142** | **Page 144** |

36 (Pages 141 to 144)

Paul Mackenzie

| | |
|---|---|
| 1 with him before. | 1 BY MR. CONSOLE: |
| 2 Q. No one other than Miss Dunn? | 2 Q. To some extent? |
| 3 A. Correct. | 3 MS. WALKER: Objection to the form. |
| 4 Q. Did he tell you that he thought her | 4 THE WITNESS: I didn't know the |
| 5 accusation was baseless? | 5 people I was working for. I didn't know the |
| 6 A. Yes. | 6 people who were working for me. I try very hard |
| 7 Q. Did he tell you he was upset about it? | 7 to be my own man and make my own decisions, and |
| 8 A. Yes. | 8 I think I was successful in approaching it this |
| 9 Q. What did he say? | 9 way. |
| 10 A. That he's a good guy. That he doesn't | 10 BY MR. CONSOLE: |
| 11 deserve it. | 11 Q. Do you agree with me that those comments |
| 12 Q. That he doesn't deserve these | 12 by Silverio to some extent made you cautious |
| 13 accusations made against him? | 13 about Miss Dunn? |
| 14 A. They're not true. | 14 MS. WALKER: Objection to the form. |
| 15 Q. So he was telling you she was lying? | 15 THE WITNESS: Anything's possible. |
| 16 MS. WALKER: Objection to the form. | 16 I don't think so. |
| 17 THE WITNESS: Yes. | 17 BY MR. CONSOLE: |
| 18 BY MR. CONSOLE: | 18 Q. But maybe? |
| 19 Q. Did he actually say that, did he say | 19 A. Maybe. |
| 20 she's lying? | 20 Q. Have you ever been accused of sexual |
| 21 A. I think he probably did. | 21 harassment? |
| 22 Q. Did you believe him? | 22 A. No. |
| 23 A. At that point when I was having these | 23 Q. Has anybody ever brought a claim of |
| 24 conversations, fifty-fifty. | 24 discrimination that involved you as the |
| Page 157 | Page 159 |

| | |
|---|---|
| 1 Q. Would you agree with me that it | 1 supervisor? |
| 2 certainly had an impact on your perception of | 2 A. I think I was actually named in the |
| 3 Miss Dunn? | 3 Potamkin suit that I mentioned earlier, but the |
| 4 MS. WALKER: Objection to the form. | 4 defense attorneys actually on my behalf, without |
| 5 THE WITNESS: No, we're talking | 5 my asking, went before the judge and asked him |
| 6 about conversations after she was gone, but yes. | 6 to remove me from the suit so that I didn't need |
| 7 BY MR. CONSOLE: | 7 an attorney and I wouldn't face any financial |
| 8 Q. Did you have conversations with | 8 ramifications. |
| 9 Mr. Silverio about her complaints before she was | 9 Q. You were named as a defendant in that |
| 10 fired, before Miss Dunn was fired? | 10 case? |
| 11 A. Only the ones I've spoken about. When I | 11 A. I think it was just maybe et al. Maybe |
| 12 started to get rumors and I confronted and asked | 12 I was on the papers. |
| 13 and blew up with him, those are the only | 13 Q. Did you ever get served with papers? |
| 14 conversations. | 14 A. Not that I remember. |
| 15 Q. Did he tell you at that time that those | 15 Q. Have you ever had a situation where |
| 16 accusations were false? | 16 someone you worked for complained of |
| 17 A. Probably. | 17 discrimination? |
| 18 Q. Did he tell you at that time that she | 18 MS. WALKER: Objection to the form. |
| 19 was a liar? | 19 MR. CONSOLE: I should rephrase it. |
| 20 A. Probably. | 20 BY MR. CONSOLE: |
| 21 Q. Would you agree with me that those | 21 Q. Have you ever had a situation where |
| 22 comments made before the decision to fire Dunn | 22 someone who worked under you complained of |
| 23 had been made influenced your view of Miss Dunn? | 23 discrimination? |
| 24 MS. WALKER: Objection to the form. | 24 A. Yes. |
| Page 158 | Page 160 |

40 (Pages 157 to 160)

Paul Mackenzie

1  Miss Machikas, and Miss Dunn were terminated;
2  correct?
3      A. Correct.
4      Q. Along with Brian Szasz?
5      A. Correct.
6      Q. No one else; correct?
7          MS. WALKER: Objection to the form.
8          THE WITNESS: I don't think so.
9  BY MR. CONSOLE:
10     Q. As of that date, were they the only
11 three female employees of Mercedes-Benz of Fort
12 Washington?
13     A. No.
14     Q. Who else was a female employee of
15 Mercedes-Benz of Fort Washington?
16     A. We had a service writer. We had a parts
17 expediter. Of course the people in the office
18 upstairs, who three of them are definitely
19 Mercedes-Benz of West Chester employees.
20     I'm not sure about Carlos'
21 secretary. She may have been Mercedes-Benz of
22 Fort Washington. She may have been Condor.
23     Q. Were these the only three females who
24 were on the floor of Mercedes-Benz of Fort

Page 165

1  actually prepare those first three pages? I
2  think you already answered that. On or about
3  November 13 of 2009; correct?
4      A. I think it said it on the 13th. But it
5  took me about three days of deciding whether I
6  should or I shouldn't getting it together and
7  sending it.
8      Q. The next two pages are called the
9  interview process.
10     A. Uh-huh.
11     Q. When did you prepare this document?
12     A. In August of 2009.
13     Q. August of 2009?
14     A. It may have been July.
15     Q. The next document is three pages,
16 "Regina Dunn and Andrew Mogilyansky" is the
17 title.
18         When did you prepare this document?
19     A. Probably around the same time as I did
20 the first one.
21     Q. So September of 2009?
22     A. Yes.
23     Q. And then the last pages of Exhibit P-46,
24 two pages under the caption, "the job threat,"

Page 167

1  Washington?
2          MS. WALKER: Objection to the form.
3          THE WITNESS: Again, I'm going to
4  say I don't think so. I think Kirstie -- I'm
5  not sure if she was employed, again, by Condor
6  or Mercedes-Benz of Fort Washington, but she
7  worked on the floor. She works at the BBC, the
8  incoming leads. She worked with the salespeople
9  on the floor.
10 BY MR. CONSOLE:
11     Q. But she may not have been employed by
12 Mercedes-Benz Fort Washington?
13     A. That is possible.
14     Q. So as far as Mercedes-Benz Fort
15 Washington employees, were the only three
16 females on the floor the three that were
17 terminated on November 3rd, 2008?
18         MS. WALKER: Objection to the form.
19         THE WITNESS: It's quite possible,
20 because I don't know the status of what the
21 others were paid.
22 BY MR. CONSOLE:
23     Q. The document that we marked earlier,
24 P-46, which is marked as P-46, when did you

Page 166

1  when were they prepared?
2      A. Pretty much as it happened. Maybe we
3  were two days in before I started understanding
4  where this was going. I wanted to make that one
5  first.
6      Q. Let me ask you to turn to Exhibit P-44.
7  This is an application prepared for David
8  Reedman to seek a position at Mercedes-Benz of
9  West Chester; is that correct?
10     A. Correct.
11     Q. Is any of the handwriting on this
12 document yours?
13     A. No.
14     Q. The date on this document is
15 October 17th, 2008. Do you see that on the last
16 page?
17     A. I'm sorry. Okay.
18     Q. When did Reedman start?
19     A. The day Regina was fired.
20     Q. So that would be November 3rd?
21     A. If that was the day she started.
22     Q. That's the day that she was fired?
23     A. Fired, sorry, yes.
24     Q. Did you have Mr. Reedman fill out this

Page 168

42 (Pages 165 to 168)

**TERRY BURKE REPORTING**

Paul Mackenzie

Page 169

```
 1    application?
 2         A.   I don't remember.
 3         Q.   What was Mr. Reedman's starting
 4    compensation?
 5         A.   I don't remember.
 6         Q.   Was it more or less than Miss Dunn?
 7         A.   I don't know what Regina was getting
 8    paid.
 9         Q.   Were you getting paid more or less than
10    Mr. Esposito?
11              MS. WALKER:  Objection to the form.
12              THE WITNESS:  Less.
13    BY MR. CONSOLE:
14         Q.   By how much?
15         A.   I don't know.
16         Q.   How do you know it was less?
17         A.   Because I was told every day.
18         Q.   Mr. Reedman, in his application, says to
19    the question, "Have you ever been convicted of a
20    felony?"  He puts "No."  Do you see that?
21         A.   Which page are we talking about?
22         Q.   The first page.
23         A.   Okay.
24         Q.   Do you see he circles "No"?
```

Page 170

```
 1         A.   I do.
 2         Q.   Were you aware of the fact that
 3    Mr. Reedman had pled guilty to driving under the
 4    influence?
 5         A.   Yes.
 6         Q.   And had he done that on one or more than
 7    one occasion?
 8         A.   Two or three times.
 9         Q.   Did that cause you concern in regard to
10    hiring him?
11         A.   Yes.
12         Q.   Did you tell anyone that Mr. Reedman had
13    been on two or three occasions convicted of
14    driving under the influence?
15         A.   Yes.
16         Q.   Who did you tell that to?
17         A.   Steve Silverio and Joann George.
18         Q.   And what was the response of Silverio?
19         A.   Would I vouch for the guy.
20         Q.   And what did you say?
21         A.   Yes.
22         Q.   What was the response of George?
23         A.   She didn't like it.
24         Q.   What did she say?
```

Page 171

```
 1         A.   I don't remember.  I just know she
 2    didn't care for it.
 3         Q.   This conversation that you had with
 4    Silverio, was that before the conversation you
 5    had with George about Reedman's drunk driving?
 6              MS. WALKER:  Objection to the form.
 7              THE WITNESS:  I don't remember.
 8    BY MR. CONSOLE:
 9         Q.   Were those conversations that you had
10    with Silverio and George regarding Reedman's
11    drunk driving after you had already offered the
12    job to Mr. Reedman?
13         A.   After.
14         Q.   Before Miss Dunn was fired, did you
15    review any documentation pertaining to issues of
16    discrimination in the workplace?
17         A.   No.
18         Q.   I'm sorry?
19         A.   No.
20         Q.   At some point in time, did you have to
21    sign an employee acknowledgment form saying that
22    you read the handbook?
23         A.   Yes.
24         Q.   And did you read the handbook before you
```

Page 172

```
 1    signed the form?
 2         A.   Probably not.
 3              MR. CONSOLE:  Let's have this
 4    marked.
 5              (P-69 was marked for
 6    identification.)
 7    BY MR. CONSOLE:
 8         Q.   I'm showing you a document marked P-69
 9    Bates stamped 750.  It appears to be an employee
10    acknowledgment form signed by you on
11    December 11th of 2008.
12              Did I accurately identify it?
13         A.   You did.
14         Q.   And is that your signature?
15         A.   It is.
16              MR. CONSOLE:  Let's take a break
17    for lunch.
18              (Lunch recess, 1:43 p.m.)
19              (Resumed, 2:26 p.m.)
20    BY MR. CONSOLE:
21         Q.   Mr. Mackenzie, at lunch, did you discuss
22    this case?
23         A.   No.
24         Q.   Who did you have lunch with?
```

43 (Pages 169 to 172)

**TERRY BURKE REPORTING**

Paul Mackenzie

1     MR. DENGLER: Objection.
2   BY MR. CONSOLE:
3     Q.  You'd stand by and do it again?
4     A.  After finding out what I found out,
5   absolutely.
6     Q.  And the finding out what you found out
7   is that she didn't tell you the truth about a
8   car?
9     A.  Correct.
10    Q.  Why didn't you document in any way the
11  fact that you found out, or you concluded that
12  she had not been truthful with you?
13    A.  With regard to?
14    Q.  The car, why didn't you document that?
15    A.  Again, I was guided by Mr. Silverio.  I
16  told him.  I still had the paperwork.  Michelle
17  may have given the paperwork on it.  I didn't.
18    Q.  What paperwork?
19    A.  The paperwork that I asked her to look
20  out for just in case someone tried to --
21    Q.  No.  My question is, why didn't you
22  document to Ms. Dunn, why didn't you document in
23  any way your rationale for terminating
24  Miss Dunn?
                                        Page 189

1     MS. WALKER: Objection to the form.
2     THE WITNESS:  To who?
3   BY MR. CONSOLE:
4     Q.  To anyone.
5     A.  But I have.  I did.
6     Q.  No.  Let me go back, then.  At the time
7   Miss Dunn was fired, had you documented the
8   reasons for terminating Miss Dunn?
9     A.  Okay.
10    Q.  That's a question?
11    A.  Say it again, because it didn't make any
12  sense.
13    Q.  At the time that you terminated
14  Miss Dunn, had you documented the reasons for
15  terminating Miss Dunn?
16    A.  I had told my superiors what was
17  happening.
18    Q.  My question was documented --
19    A.  They, they were responsible for
20  documenting.
21    Q.  So you felt that they had prepared
22  documentation?
23    A.  No.  They said they would handle it.
24  And I said these are my reasons.  If they had
                                        Page 190

1   asked me at that point, okay, document it and
2   give it to us, I would absolutely have done
3   that.
4     Q.  So the reason why you didn't document
5   anything is because you thought they were going
6   to document things, is that your testimony?
7     A.  No.
8     Q.  Then why didn't you document anything?
9     A.  Whether they did or they didn't, not
10  that I thought they would, they never asked me
11  to.  They said we will take it from you.
12    Q.  The gist of the conversation, by the
13  way, is basically that you say that Miss Dunn
14  was not honest with you in connection with a
15  conversation; correct?
16    A.  Correct.
17    Q.  Did anybody ever ask Miss Dunn for her
18  version of that conversation?
19    A.  I do not know.
20    Q.  Shouldn't she have been asked?
21    MS. WALKER: Objection to the form.
22    THE WITNESS:  I do not know.
23  BY MR. CONSOLE:
24    Q.  Would you have expected as general
                                        Page 191

1   manager that someone would ask Miss Dunn for her
2   version of the conversation upon which she is
3   allegedly being fired?
4     MS. WALKER: Objection to the form.
5     THE WITNESS:  I would.
6   BY MR. CONSOLE:
7     Q.  To the best of your knowledge, did
8   anyone ever speak to Miss Dunn to ask her what
9   happened in this conversation with you that you
10  took offense to?
11    A.  No.
12    Q.  Why wasn't Miss Dunn herself given a
13  document, a written warning or written reprimand
14  to advise her of what she was being accused of
15  so she could respond to it?
16    A.  Again, I don't know.
17    Q.  Do you think she should have as a matter
18  of general management principles?
19    MS. WALKER: Objection to the form.
20    THE WITNESS:  I would have.
21  BY MR. CONSOLE:
22    Q.  Because that would be the fair thing to
23  do; correct?
24    MS. WALKER: Objection to the form.
                                        Page 192

48  (Pages 189 to 192)

TERRY BURKE REPORTING

Paul Mackenzie

**Page 193**

1  THE WITNESS: It would have been
2 the right thing to do, yes.
3 BY MR. CONSOLE:
4  Q. Do you have any explanation as to why
5 that wasn't done in this case?
6  A. No.
7  Q. Did you ever see Miss Dunn's personnel
8 file?
9  A. No.
10  Q. Did she have a personnel file?
11  A. My immediate reaction was yes, she
12 should have.
13  Q. Why didn't you look at it before you
14 fired her?
15  MS. WALKER: Objection to the form.
16  THE WITNESS: Again, out of my
17 hands. If I had been told, if I'd have been
18 given the full power in the dealership, maybe I
19 would have done those things.
20 BY MR. CONSOLE:
21  Q. What do you mean by that?
22  A. The power to hire and fire. My
23 interaction with everyone in the dealership
24 would have been different if I had had that

**Page 194**

1 power.
2  Q. You felt you did not have that
3 power?
4  A. Correct.
5  Q. You felt Silverio held that power over
6 you?
7  MS. WALKER: Objection to the form.
8  MR. DENGLER: Same objection.
9  THE WITNESS: Yes.
10 BY MR. CONSOLE:
11  Q. Let's turn to Exhibit P-7, please.
12  I'm sorry, P-5. I'm sorry,
13 actually P-7. This is the letter of August 5,
14 2008, P-7.
15  This is the letter of August 5th,
16 2008, that Miss Dunn wrote to Carlos
17 Hoz de Vila, who then shared it with
18 Mr. Silverio.
19  Have you ever read this?
20  A. I don't think so.
21  Q. Do you agree with me that the sales
22 performance of Mercedes-Benz Fort Washington
23 played no role in the decision to terminate
24 Miss Dunn?

**Page 195**

1  A. Yes.
2  Q. You say that you spoke to your sales
3 reps on your first day on the job.
4  A. Uh-huh.
5  Q. When did you first speak to Miss Dunn?
6  A. First day.
7  Q. Do you recall that conversation with
8 her?
9  A. Not in any great detail.
10  Q. Was it a one-on-one?
11  A. They were all one-on-ones. There was a
12 group and then one-on-ones.
13  Q. Can you recall anything in relation to
14 your conversation with Miss Dunn on Day 1?
15  A. It's usually the standard. I'm not here
16 to make judgments. I'm not here to make any
17 changes. Tell me everything.
18  Q. You say it's usually the standard. My
19 question is, as you sit here today, do you have
20 that recollection of having that discussion with
21 Miss Dunn, or are you just testifying as to what
22 your standard operating procedure is?
23  A. SOP, standard operating procedure.
24  Q. If I focus specifically on Miss Dunn as

**Page 196**

1 you sit here today, do you have a recollection
2 of your first meeting with her?
3  A. Not really.
4  Q. As you sit here today, do you have a
5 recollection of any meetings with her?
6  A. Uh-huh, yes.
7  Q. What's the first meeting you recall
8 having with her?
9  A. Within that first day or the next day,
10 but they would be ongoing, and again, this is
11 not a meet me in my office at two o'clock and
12 let's have a conversation. It is in the first
13 week I'm anywhere, I like to just observe, drift
14 in and out of conversations, drift in and out of
15 offices, sit down, just talk, try and get to
16 know the players involved. So I don't think I
17 remember any real formal meeting as such, but
18 lots of conversations.
19  Q. As you sit here today, do you have a
20 recollection of your first conversation that you
21 had with Miss Dunn?
22  A. (Witness nods.)
23  MR. DENGLER: You have to answer.
24 BY MR. CONSOLE:

49 (Pages 193 to 196)

**Paul Mackenzie**

Page 201

```
1   salespeople, and I don't really remember.  Vlad
2   maybe?  Maybe I'm getting his name wrong.
3   Another salesperson and Steve Silverio.
4       Q.  Was the other salesperson Demitri?
5       A.  Demitri, I'm sorry, Demitri.
6       Q.  He is the one earlier you couldn't
7   recall the name of; right?
8       A.  Yes.
9       Q.  So there was Vlad, Demitri and Silverio
10  or --
11      A.  No.  Vlad is Demitri.
12      Q.  So Demitri, Silverio and you?
13      A.  And one other salesperson.
14      Q.  And you don't remember who that was?
15      A.  I don't remember.
16      Q.  It was a man; correct?
17      A.  Yes.
18      Q.  Tell me the conversation.
19      A.  Basically it was talking about the past,
20  do you remember when, do you remember when this
21  happened.  Kind of Mr. Silverio holding court.
22  And among the things that he brought up was the
23  fact that Regina and Joe did have a
24  relationship.
```

Page 202

```
1       Q.  And what were the terms he used?
2       A.  The crudest.
3       Q.  Can you tell us?  Don't hold back,
4   because we need to know the exact words.
5       A.  That he did her upstairs in the
6   bathroom.  She was seen giving him a blow job in
7   the parking lot.  And other stuff that was just
8   as crude.
9       Q.  That was while Miss Dunn was still an
10  employee?
11      A.  No.  This was after.
12      Q.  This was after she was fired?
13      A.  Months after.
14      Q.  You say "other things that were just as
15  crude." What else did he say?
16      A.  I really can't remember the details, but
17  as crude as you imagine.  He's a very crude
18  person.  So yeah, having sex here, having sex
19  there, doing this, doing that.  He's married.
20  He's my cousin.  Just general bad stuff.
21      Q.  Did you ever hear him refer to women as
22  "bitches"?
23      A.  Yes.
24      Q.  Who did you hear him refer to as a
```

Page 203

```
1   bitch?
2       A.  The office manager.
3       Q.  Who is that?
4       A.  Michelle Tyler.
5       Q.  Who else?
6       A.  His ex-wife.
7           I know there were others.  I just
8   can't place the people.
9       Q.  Did you ever hear him refer to anyone as
10  a cunt?
11      A.  Yes.
12      Q.  Who?
13      A.  The same people.
14      Q.  Tyler?
15      A.  Yes.
16      Q.  Was Tyler still an employee when he
17  referred to her as a cunt?
18      A.  Yes.
19      Q.  Did you ever hear him refer to an
20  African American using racially derogatory
21  terms?
22      A.  Yes.
23      Q.  Have you heard him use the
24  word "nigger"?
```

Page 204

```
1       A.  Yes.
2       Q.  Who did you hear him refer to as a
3   nigger?
4       A.  My daughter's boyfriend.
5       Q.  Your daughter's boyfriend, she was
6   dating an African American?
7       A.  Yes.
8       Q.  And he referred to that person as a
9   nigger?
10      A.  Uh-huh.
11      Q.  What was the context?
12      A.  I would never let my daughter date..."
13  "well, you have no choice about it.  My
14  daughter's boyfriend is African American." "You
15  let your daughter date a nigger?"
16      Q.  When was this?
17      A.  I'd say probably about the five- or
18  six-month mark he felt comfortable enough.
19      Q.  Did you ever hear him make remarks about
20  gay people?
21      A.  Yes.
22      Q.  Did you ever hear him use terms such as
23  "queer," "faggot"?
24      A.  Yes.
```

51 (Pages 201 to 204)

**TERRY BURKE REPORTING**

Paul Mackenzie

| | |
|---|---|
| 1 | to your daughter's boyfriend? |
| 2 | A.  Yes. |
| 3 | Q.  Did you tell him about the references to |
| 4 | Tom Palmer? |
| 5 | A.  Yes. |
| 6 | Q.  When did you first have that |
| 7 | conversation with Petruzziello? |
| 8 | A.  The day he called my daughter a spic. |
| 9 | Q.  Who called your daughter a spic? |
| 10 | A.  Steve Silverio. |
| 11 | Q.  Your daughter a spic? |
| 12 | A.  Uh-huh. |
| 13 | Q.  What's the rationale there? |
| 14 | A.  She's Puerto Rican. |
| 15 | Q.  So he calls her a spic and makes a |
| 16 | comment about her boyfriend? |
| 17 | A.  No.  A comment about the boyfriend was |
| 18 | first, and I said my daughter dated an African |
| 19 | American.  He said, "Well, at least she's not |
| 20 | dating a spic."  I said, "Well, my daughter is |
| 21 | Puerto Rican."  It was that day I went to Vince, |
| 22 | and I don't remember when it was and I'm |
| 23 | thinking it's halfway through my time there. |
| 24 | Q.  Did anyone ever get back to you with the |

Page 209

| | |
|---|---|
| 1 | Q.  Why not? |
| 2 | A.  Once I sent the letter, which I believe |
| 3 | was on a Friday, I was leaving the country for |
| 4 | three weeks.  I think I had been in the hospital |
| 5 | maybe two weeks before that, and I guess I would |
| 6 | absolutely have stated those things.  I just |
| 7 | didn't feel I was -- I had no response so I |
| 8 | didn't feel I was getting anywhere. |
| 9 | So my request was, put this in |
| 10 | front of Park Avenue, get me in front of them. |
| 11 | And I had hoped at that time to be given the |
| 12 | forum to explain everything. |
| 13 | Q.  Including Silverio's racist, |
| 14 | anti-Semitic, sexist comments? |
| 15 | A.  Correct. |
| 16 | Q.  Did you not reference those comments in |
| 17 | this letter to Joann George because you were |
| 18 | fearful that you would be retaliated against if |
| 19 | you did? |
| 20 | MS. WALKER:  Objection to the form. |
| 21 | THE WITNESS:  Yes. |
| 22 | BY MR. CONSOLE: |
| 23 | Q.  Why did you have that fear? |
| 24 | A.  Because I had stopped doing anything |

Page 211

| | |
|---|---|
| 1 | results of any investigation into your complaint |
| 2 | about Mr. Silverio? |
| 3 | A.  No one responded to anything until I |
| 4 | sent a letter. |
| 5 | Q.  How long after your complaint about |
| 6 | Mr. Silverio was it that you were fired? |
| 7 | MS. WALKER:  Objection to the form. |
| 8 | THE WITNESS:  The complaint |
| 9 | verbally to Vince or the letter? |
| 10 | BY MR. CONSOLE: |
| 11 | Q.  The complaint verbally to Vince. |
| 12 | A.  Six months. |
| 13 | Q.  And how long after the letter? |
| 14 | A.  Two, three months.  I think I sent a |
| 15 | letter in November and I think I responded |
| 16 | March 1st, so. |
| 17 | Q.  In the letter you don't make any |
| 18 | reference to either the vulgar and inappropriate |
| 19 | comments of Silverio or your complaint about |
| 20 | Silverio, do you? |
| 21 | MR. DENGLER:  Objection to the |
| 22 | form. |
| 23 | THE WITNESS:  That is correct. |
| 24 | BY MR. CONSOLE: |

Page 210

| | |
|---|---|
| 1 | other than what I thought was the right thing to |
| 2 | do in terms of running my business, which meant |
| 3 | if I wasn't upsetting Carlos Hoz de Vila one |
| 4 | day, I was upsetting Vince Petruzziello and I |
| 5 | was upsetting Steve Silverio.  They were |
| 6 | fighting literally. |
| 7 | I lost complete faith in that |
| 8 | hierarchy of management.  I didn't want to |
| 9 | appear, I think in that letter, like it was -- |
| 10 | it was much personal.  The things about my |
| 11 | children are very hurtful, so I didn't want it |
| 12 | to appear personal.  If I committed it to paper, |
| 13 | it would have come out that way.  So I figured I |
| 14 | had the right to speak to the people at Park |
| 15 | Avenue and tell them.  I think if I would have |
| 16 | put it in there, I don't think I would have |
| 17 | gotten the chance.  Because I knew where it was |
| 18 | going.  I don't think I would have got the |
| 19 | chance, so I just, I guess, thought that was my |
| 20 | best chance. |
| 21 | Q.  In other words, if you had referenced |
| 22 | those comments, you wouldn't have gotten a |
| 23 | chance to speak to Park Avenue, is that your |
| 24 | thought? |

Page 212

53 (Pages 209 to 212)

Paul Mackenzie

| | |
|---|---|
| 1   because Mr. Esposito was fired? | 1   those are the things that -- that is the thing |
| 2       A.  No. | 2   that I used. |
| 3       Q.  Did you think when you met with | 3   BY MR. CONSOLE: |
| 4   Miss Dunn initially that she was going to leave | 4       Q.  Did that list have the date by each line |
| 5   Mercedes-Benz relatively soon no matter what | 5   item? |
| 6   happened? | 6       A.  No. |
| 7       A.  Yes. | 7       Q.  So how did you come up with the dates, |
| 8       Q.  Why was that? | 8   then? |
| 9       A.  Didn't want to be there. | 9       A.  You get out a calendar, you read the |
| 10      Q.  Did you ever tell Miss Dunn that you | 10  dates that you do have, and to the best of your |
| 11  were open to keeping her? | 11  recollection, you put it down. |
| 12      A.  Yes. | 12      Q.  Well, for example, you have an |
| 13      Q.  When did you tell her that? | 13  October 8th, 2008, entry here. |
| 14      A.  The first day, second day. | 14      A.  Uh-huh. |
| 15      Q.  Did you ever tell her that she was | 15      Q.  And you say, "By the end of the day, I |
| 16  having a job interview with you? | 16  had already caught Regina Dunn in several |
| 17      A.  Yeah, that sounds like something I would | 17  serious lies, and again I urged her to be |
| 18  say, consider this a job interview. | 18  candid." |
| 19      Q.  Consider what a job interview? | 19          Now, what is the basis for your |
| 20      A.  Our next interaction, our interaction | 20  saying that this conversation happened on |
| 21  over the next two, three, four, five days. | 21  October 8th, 2008, when you prepared this |
| 22      Q.  Let me turn to Page 3755 of Exhibit | 22  document? |
| 23  P-46.  Again, this document I think you | 23      A.  To the best of my recollection. |
| 24  testified this morning was prepared some time | 24      Q.  But that wasn't jogged by a date entry |
| **Page 225** | **Page 227** |

| | |
|---|---|
| 1   around November of 2009; correct? | 1   on your missing notes? |
| 2       A.  Uh-huh. | 2       A.  I don't know.  That could have been the |
| 3       Q.  Yes? | 3   one line that was dated. |
| 4       A.  Yes. | 4       Q.  Or it could be that you're just |
| 5       Q.  Am I correct that you didn't have, when | 5   estimating? |
| 6   you prepared this document, a recollection of | 6       A.  Yes. |
| 7   the various meetings you had on the various | 7       Q.  Is it true that by October 8th, 2008, |
| 8   dates listed here, is that true? | 8   you had caught Regina Dunn in several serious |
| 9          MS. WALKER:  Objection to the form. | 9   lies? |
| 10         THE WITNESS:  I'm sorry, repeat | 10      A.  According to my standards, yes. |
| 11  that. | 11      Q.  This is your third day on the job. |
| 12  BY MR. CONSOLE: | 12      A.  Uh-huh. |
| 13      Q.  In other words, when you're preparing | 13      Q.  What were the lies that you had caught |
| 14  this document in November of 2009 -- | 14  Miss Dunn in as of October 8th? |
| 15      A.  Right. | 15      A.  I'm reading. |
| 16      Q.  -- do you just recall that on | 16          I think this is the -- the car was |
| 17  October 8th, 2008, you had a meeting with | 17  Day 3.  Maybe it was Day 2.  So that would be |
| 18  Miss Dunn? | 18  one.  I don't remember specifically. |
| 19         MS. WALKER:  Objection to the form. | 19      Q.  As you sit here today, is there any |
| 20         THE WITNESS:  No.  If you would | 20  other event that you would call a lie by |
| 21  think back to what I said, I like to keep a | 21  Miss Dunn other than that event that you have |
| 22  running total of things that kind of I reed them | 22  testified to at some length today -- |
| 23  and it sparks my memory.  That is the list that | 23      A.  Yes. |
| 24  I kept on the computer at work.  So I believe | 24      Q.  -- involving that car? |
| **Page 226** | **Page 228** |

57 (Pages 225 to 228)

Paul Mackenzie

Page 229

1  A. Yes. Lying to me about deals, what's
2  happening with this deal, what's happening with
3  that deal? Did you call this customer? That
4  kind of stuff. Stuff that I would go to a
5  salesperson and the salesperson would say, no,
6  that didn't happen.
7  Q. I'd like to be as specific as we can.
8  So we've got one example of what you're calling
9  a lie, you testified to. Is there any other
10  examples of a lie that you can tell us about
11  today?
12  MS. WALKER: Objection to the form.
13  THE WITNESS: Yeah, I don't recall
14  any as big as the one I testified to. The rest
15  just fell into the day-to-day running of the
16  organization.
17  BY MR. CONSOLE:
18  Q. I don't care if they're big or small.
19  Can you tell me any other lie?
20  A. I still can't recollect.
21  Q. You write on October 8th that, you
22  write, "I also asked why she spent hours walking
23  around the dealership talking on her cell phone
24  in an animated fashion."

Page 230

1  A. Uh-huh.
2  Q. Do you recall asking her that?
3  A. Yes.
4  Q. What did she say?
5  A. Talking to her nanny.
6  Q. Did you believe her?
7  A. No.
8  Q. Why not?
9  A. My gut.
10  Q. Your gut told you on Day 3 that she was
11  lying to you about talking to her nanny?
12  A. Yes.
13  Q. Can you explain that?
14  A. If I had employed a nanny that I would
15  have to be that aggravated on the phone and
16  walking and stamping and splaying my arms, I'd
17  fire the nanny. That didn't make any sense to
18  me at all --
19  Q. You thought it was too animated the way
20  she was talking to her nanny?
21  A. Uh-huh.
22  Q. Have you ever had a nanny?
23  A. I haven't been that lucky, no.
24  Q. You think a mother would not be

Page 231

1  emotional when talking to a nanny?
2  MS. WALKER: Objection to the form.
3  THE WITNESS: That is two different
4  things all together.
5  BY MR. CONSOLE:
6  Q. I'm trying to understand why --
7  A. I'm saying, if you have to be that
8  emotional, if there's something going on that's
9  obviously perturbing you because you are so
10  upset as you're talking up and down, you're so
11  outraged, yeah, I think some part of me was
12  like, yeah, if that was my nanny, I'd probably
13  fire them.
14  Q. You still have to have a nanny. If you
15  fire a nanny, you have to have a replacement
16  nanny; right?
17  MS. WALKER: Objection to the form.
18  THE WITNESS: I guess so.
19  BY MR. CONSOLE:
20  Q. So is there any other reason that you
21  believe she was lying when she said she was
22  talking to her nanny other than that she seemed
23  animated and you had a gut feeling?
24  A. No.

Page 232

1  Q. Now, you write here, "I suspect she was
2  talking to Joe Esposito (covering tracks) and I
3  said so." Is that a true statement?
4  A. Yes.
5  Q. So you told Miss Dunn on Day 3 that you
6  suspected she was talking to Esposito?
7  A. No. I think my said so would be to
8  Mr. Silverio in my efforts to tell him I needed
9  to move ahead. Tell me more, what's happening.
10  Q. So you spoke to Silverio about your
11  belief that Dunn was talking to Esposito?
12  A. Actually, I think he brought it up. He
13  was in the dealership. He was in the dealership
14  and he brought it up and he said.
15  Q. He said what?
16  A. She's talking to Esposito.
17  Q. That's what Silverio told you?
18  A. Yes.
19  Q. Did he indicate why he concluded that?
20  A. No.
21  Q. And what does the parens, "covering
22  tracks" mean in that entry?
23  A. When a person leaves a dealership
24  unexpectedly, the person doesn't usually get the

58 (Pages 229 to 232)

Paul Mackenzie

**Page 233**

1 opportunity to tie up all the loose ends, and
2 there are a lot of loose ends that you can leave
3 unexpectedly, some of them good, some of them
4 are not good, some of them just have the
5 appearance of not being good. But if you want
6 to keep any kind of good name going forward,
7 then you need to cover your tracks, you need to
8 make sure that everything you started is
9 finished, good, bad or indifferent.
10    Q. So Esposito was covering his tracks, is
11 what you meant by that entry?
12    A. No. Because he's not in the dealership
13 so he needs someone else to cover them for him.
14    Q. But you never spoke to Dunn saying I
15 think you're talking to Esposito?
16    A. No.
17    Q. The next line, "She neither confirmed or
18 denied this. She just walked away."
19       Have I read that right?
20    A. Yes.
21    Q. What's that referring to?
22    A. Maybe I did ask.
23    Q. Do you want to change your testimony
24 from 30 seconds ago?

**Page 234**

1       MS. WALKER: Objection to the form.
2       THE WITNESS: No, I don't think I
3 have a clear recollection of what the
4 conversation was. I don't usually, I don't
5 usually accuse someone without knowing for sure
6 and that would be accusatory for me. Then
7 again, maybe I was mad.
8 BY MR. CONSOLE:
9    Q. So you don't know if that's a true
10 statement?
11    A. Correct.
12    Q. You say, "I told Steve Silverio of these
13 events, but he gave no input." That's not
14 accurate either, is it?
15       MS. WALKER: Objection to the form.
16       THE WITNESS: We are talking about
17 a conversation where Steve was the first one to
18 bring it up.
19 BY MR. CONSOLE:
20    Q. Right.
21    A. It's not one day or two days. It's
22 every day. Steve was at the store every other
23 day and when he wasn't there, I probably, again,
24 to make my case, it's still going on, and he

**Page 235**

1 would walk away from any of those conversations.
2    Q. But Silverio is the one who actually
3 raised it with you?
4    A. Yes.
5    Q. You then write, "I pushed further and
6 told him I also didn't believe she had the
7 requisite skills for her position."
8    A. Uh-huh.
9    Q. Is that a true statement?
10    A. Yes.
11    Q. What skills did you tell Mr. Silverio
12 that Miss Dunn was lacking?
13    A. People skills.
14    Q. Anything else?
15    A. Well, she hadn't performed on a business
16 level for me to critique.
17    Q. It's only Day 3; right?
18    A. A lot happens in a day.
19    Q. So by Day 3 you've concluded that
20 Miss Dunn does not have the people skills to be
21 successful in her position?
22    A. Correct.
23    Q. Do you ever write that anywhere?
24    A. No.

**Page 236**

1    Q. What did Silverio say?
2    A. Nothing.
3    Q. You write here, "He told me to give it
4 another week and consider her for a finance
5 position."
6       Is that a true statement?
7    A. Maybe that's the time he brought it up.
8    Q. Do you know?
9    A. No. I just know that he did.
10    Q. Then you write, "I told him I would,
11 reluctantly." Did I read that correctly?
12    A. You did.
13    Q. And that means that you would consider
14 her for a finance position; correct?
15    A. No. That just means I told him I would.
16    Q. So you were lying to him?
17    A. (Witness nods.)
18    Q. You have to answer verbally.
19    A. I'm sorry. Yes.
20    Q. Why were you lying to him on Day 3 of
21 the job?
22    A. Tit for tat.
23    Q. Because you concluded that he had been
24 lying to you?

59 (Pages 233 to 236)

Paul Mackenzie

**Page 237**

1    A.  Uh-huh.
2    Q.  Yes?
3    A.  Yes.
4    Q.  As of this point in time, this
5  October 6th, this event with the car that you
6  testified to wasn't even discovered yet;
7  correct?
8        MS. WALKER:  Objection to the form.
9        THE WITNESS:  It was very early on
10  about the car, so I started on the 6th, this is
11  the 8th, the 9th.  It could have been at that
12  time.
13  BY MR. CONSOLE:
14    Q.  You don't reference it?
15    A.  Maybe it wasn't.
16    Q.  It is such a big deal, you would
17  reference it, wouldn't you?
18        MS. WALKER:  Objection to the form.
19        THE WITNESS:  No.
20  BY MR. CONSOLE:
21    Q.  Why not?
22    A.  I'm three days on the job.  I'm trying
23  to tell everything I can for the people I work
24  for and let them handle it.

**Page 238**

1    Q.  So you're going to reference you don't
2  think Regina Dunn has people skills, but you're
3  not going to reference an issue where you think
4  she's lied to you about a car?
5    A.  Apparently so.
6    Q.  Isn't it true you moved your desk into
7  Regina Dunn's office on October 30th, 2008,
8  right before she was fired?
9    A.  No.
10    Q.  Are you sure about that?
11    A.  Yes.
12    Q.  When did you move your desk into her
13  office?
14    A.  I think it was two weeks, which would
15  make it the 20th.
16    Q.  20th?
17    A.  Or around there.
18    Q.  Let's look at your, back to P-46, the
19  October 9th entry.  "I moved my (actual) desk
20  into Regina's office to watch her work and
21  assess her desk and turnover skills up close."
22        Have I read that correctly?
23    A.  You have.
24    Q.  Is that a true statement?

**Page 239**

1    A.  That I moved it in there or the date?
2    Q.  The date?
3    A.  The statement's true.  The date I don't
4  know.
5    Q.  So you think as you sit here today that
6  that date's wrong?
7    A.  Yes.
8    Q.  Do you know why you put the wrong date
9  in this form?
10    A.  Maybe I didn't have the date by it in my
11  list.
12    Q.  Any other reason?
13    A.  No.
14    Q.  You then say, "My fears were confirmed
15  immediately and in my opinion she was a
16  substandard desk person at best and her turnover
17  skills were very combative."
18    A.  Uh-huh.
19    Q.  Is this by Day 4 you concluded this?
20    A.  Yes.
21    Q.  What did you see that made you conclude
22  that she was a substandard desk person at best?
23    A.  Not controlling the deal.  Not
24  controlling the salesperson in the deal or the

**Page 240**

1  salespeople controlled her, which means the
2  salespeople didn't come in and ask.  They came
3  in and told.
4    Q.  Did you think they didn't show the
5  requisite amount of respect for her?
6        MS. WALKER:  Objection to the form.
7        THE WITNESS:  I can't answer that.
8  I don't know what happened before.  Maybe this
9  was a code of contact that was encouraged.
10  BY MR. CONSOLE:
11    Q.  Did you think that the salespeople, the
12  salesmen on the floor were showing a lack of
13  respect for Miss Dunn in the way they treated
14  her?
15    A.  Good point.  Yes.
16    Q.  Did you do anything about that?
17    A.  Yes.
18    Q.  What did you do?
19    A.  I tried to exert the processes with the
20  sales room before I got any others, and I would
21  tell them you have to give us a chance to make
22  the deals, which means don't take shortcuts, do
23  this, this, and this.  And if I see you come in
24  the office without going through this, this, and

60 (Pages 237 to 240)

Paul Mackenzie

| # | Page 241 | # | Page 243 |
|---|---|---|---|
| 1 | this, we're going to have a problem. You must | 1 | Day 3. So that would line up with that, so yes. |
| 2 | respect the desk. | 2 | Q. As of this point in your chronology here |
| 3 | Q. Did you see anything from Miss Dunn that | 3 | that we're looking at as part of P-46, am I |
| 4 | made you think that she was combative or very | 4 | correct that there is no reference to this car |
| 5 | combative? | 5 | issue? |
| 6 | A. Yes. I saw her with two customers that | 6 | A. Correct. |
| 7 | she was arguing with. | 7 | Q. According to what you wrote here, your |
| 8 | Q. About what? | 8 | decision to terminate Miss Dunn was made based |
| 9 | A. By the time I got past, one of the | 9 | on your observing her interactions with |
| 10 | customers got up. They were mad. It wasn't a | 10 | customers; correct? |
| 11 | negotiation. It was browbeating. She took a | 11 | A. That was part of it, yes. |
| 12 | combative position. | 12 | Q. And then the fact that she spent too |
| 13 | Q. Did you overhear the conversation or | 13 | much time on a cell phone? |
| 14 | were you watching it from a distance? | 14 | A. And the fact that she didn't desk deals |
| 15 | A. Watching it from a distance. By the | 15 | correctly, and the fact that she wasn't |
| 16 | time I got over there, I heard one of the | 16 | available to the salespeople when they needed |
| 17 | customers say pretty much, "Let's go, let's go, | 17 | her. |
| 18 | let's go." | 18 | Q. So your decision to fire Miss Dunn was |
| 19 | Q. Did you speak to Miss Dunn about that | 19 | made without any regard to the car issue that |
| 20 | conversation? | 20 | you testified to earlier in this deposition; |
| 21 | A. I actually followed the customer. | 21 | correct? |
| 22 | Q. My question was, did you speak to | 22 | MR. TINARI: I object to the form. |
| 23 | Miss Dunn about that conversation? | 23 | THE WITNESS: No. It is just that |
| 24 | A. No. | 24 | I haven't listed about the car yet. |

| # | Page 242 | # | Page 244 |
|---|---|---|---|
| 1 | Q. Why not? | 1 | BY MR. CONSOLE: |
| 2 | A. I've answered the question several | 2 | Q. I want to focus on this. Are you saying |
| 3 | times. I'm pretty much done at this point. | 3 | that when you first considered terminating |
| 4 | Q. "This point," being Day 4? | 4 | Miss Dunn, are you saying that that was before |
| 5 | A. 4, 5. | 5 | or after the issue arose with the car? |
| 6 | Q. You say, the next line, "In many cases, | 6 | MS. WALKER: Objection to the form. |
| 7 | she alienated customers and in some instances | 7 | THE WITNESS: I'm saying they all |
| 8 | she got into arguments with them." Is that what | 8 | happened around the same time. |
| 9 | you just referred to, or is there something | 9 | BY MR. CONSOLE: |
| 10 | else? | 10 | Q. Is it possible that the car issue |
| 11 | A. That would be it. | 11 | happened after you had made a decision to |
| 12 | Q. You say, the next line, "I apprised | 12 | terminate Miss Dunn? |
| 13 | Steve Silverio of these findings, and I again | 13 | MS. WALKER: Objection to the form. |
| 14 | asked to be allowed to fire her." | 14 | THE WITNESS: I do not think so. |
| 15 | A. Uh-huh. | 15 | BY MR. CONSOLE: |
| 16 | Q. Is that true that you asked to be | 16 | Q. But as far as your written materials |
| 17 | allowed to fire her on October 9th? | 17 | here, do you have any explanation as to why you |
| 18 | A. Yes. But we already decided this date | 18 | would not have referenced the car issue before |
| 19 | may be wrong. | 19 | referencing your decision to terminate |
| 20 | Q. My question is, is it true that you had | 20 | Miss Dunn? |
| 21 | made the decision to fire her by October 9th? | 21 | MS. WALKER: Objection to the form. |
| 22 | A. Yeah, I'd have to refer back to the | 22 | Mischaracterization of testimony. |
| 23 | situation of the car. I'm pretty sure this was | 23 | BY MR. CONSOLE: |
| 24 | all around the same time. I think the car was | 24 | Q. You can answer it. |

61 (Pages 241 to 244)

Paul Mackenzie

1    A. I think I did everything that I was
2  supposed to do with respect to my superiors and
3  giving them the information that they needed to.
4    Q. My question is, do you have any
5  explanation as to why in this document that you
6  prepared you did not reference the car issue
7  before you referenced a decision to terminate
8  Miss Dunn?
9      MS. WALKER: Objection to the form.
10  Mischaracterization of the testimony.
11  BY MR. CONSOLE:
12    Q. You can answer it.
13    A. No.
14    Q. You had decided to terminate Miss Dunn
15  before you had even met with Mr. Moglilyansky;
16  correct?
17    A. Yes.
18      I ran across him a couple of times.
19  Regina had pointed him out to me. I may have
20  said hi. I may have shared a brief conversation
21  with him. I think Steve Silverio tried to
22  introduce me to him, but I couldn't say -- so
23  he may have come across my path before I
24  actually sat down and had an in-depth what he

Page 245

1  was about --
2    Q. Isn't it true that you met Andrew
3  Moglilyansky for the first time on October 10th?
4    A. I think I just answered that in the
5  previous. I may have run across him before and
6  said hi.
7    Q. I'm looking at the October 10th entry on
8  Exhibit P-46, "I met Andrew Moglilyansky for the
9  first time." Is that a true statement?
10    A. I think it's more accurate to say that's
11  when I sat down with him the first time.
12    Q. The first time you had any kind of
13  substantive discussion with him?
14    A. Yes.
15    Q. And am I correct, then, that your
16  decision to fire Miss Dunn had been made before
17  you sat down and had a substantive discussion
18  with Mr. Moglilyansky for the first time?
19    A. Yes.
20    Q. Now, at some point did you conclude that
21  Mr. Moglilyansky's relationship with the
22  dealership of Mercedes-Benz of Fort Washington
23  was not appropriate?
24    A. Yes.

Page 246

1    Q. And when did you reach that conclusion?
2    A. On the day that he told me how his
3  business model worked.
4    Q. And when he told you how his business
5  model worked, did he indicate to you -- first of
6  all, how long had he been doing business with
7  Mercedes-Benz Fort Washington?
8    A. Six months maybe.
9    Q. Who brought him to Mercedes-Benz of Fort
10  Washington?
11    A. I don't know.
12    Q. Isn't it true that it was Mr. Silverio?
13      MS. WALKER: Objection to the form.
14      THE WITNESS: I have no idea.
15  BY MR. CONSOLE:
16    Q. Did you ever ask him how he got there?
17    A. Many, many times.
18    Q. Ask Mr. Silverio?
19    A. Mr. Moglilyansky.
20    Q. What did he say?
21    A. That he did business with all of the
22  dealerships in the area. He did business with
23  Cherry Hill Mercedes, Cherry Hill Volkswagen.
24  He named ten dealerships and he said he just

Page 247

1  happened to come into the dealership one time.
2    Q. At some point in time did you speak to
3  Mr. Silverio about Moglilyansky?
4    A. Yes.
5    Q. And did you tell Silverio that you
6  thought the dealership should stop doing
7  business with Moglilyansky?
8    A. Yes.
9    Q. When did you first tell Silverio that?
10    A. Pretty soon after that first meeting.
11  Days.
12    Q. Some time in October of '06?
13    A. Yes, uh-huh.
14    Q. Did Mercedes-Benz stop doing business
15  with Moglilyansky?
16    A. Mercedes-Benz of Fort Washington?
17    Q. Yes.
18    A. No.
19    Q. Did Mercedes-Benz of Fort Washington
20  continue to do business with Moglilyansky through
21  the date of your termination?
22    A. No. He was in jail by then.
23    Q. So when did Mercedes-Benz of Fort
24  Washington stop doing business with Moglilyansky?

Page 248

62 (Pages 245 to 248)

TERRY BURKE REPORTING